**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JESSE ENGRAM, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 21-1834 |
| | ) | |
| v. | ) | Magistrate Judge Maureen P. Kelly |
| | ) | |
| BERNADETTE MASON, *Superintendent,* | ) | Re: ECF No. 1 |
| *State Correctional Institution at Mahanoy*; | ) | |
| THE ATTORNEY GENERAL OF THE | ) | |
| STATE OF PENNSYLVANIA; *and* | ) | |
| DISTRICT ATTORNEY OF ALLEGHENY | ) | |
| COUNTY, | ) | |
| | ) | |
| Respondents. | ) | |

## OPINION

Jesse Engram ("Petitioner") is a state prisoner currently incarcerated at the State Correctional Institution at Greene ("SCI-Greene") in Waynesburg, Pennsylvania. Petitioner seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254 from his state criminal convictions for murder of the first degree, in violation of 18 Pa. C.S.A. § 2502(a), and firearms not to be carried without a license, in violation of 18 Pa. C.S.A. § 6106(a)(1), in the Court of Common Pleas of Allegheny County, Pennsylvania, at Docket No. CP-02-CR-15304-2008. ECF No. 14-1 at 8. See also Docket, Com. v. Engram, No. CP-02-CR-15304-2008 (C.C.P. Allegheny Cnty) (available at https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-02-CR-0015304-2008&dnh=8ayWH8WtAzxFfOe5LrQh5w%3D%3D (last visited Mar. 11, 2025)). Petitioner currently is serving a sentence of life imprisonment, with a consecutive sentence of 2-4 years imprisonment. ECF No. 14-1 at 84.

1

Currently before this Court is Petitioner's Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (the "Petition"), which was filed on December 20, 2021.  ECF No. 1.[1]  For the reasons that follow, the Petition will be denied.  A certificate of appealability will be granted as to the portion of Ground One asserting that trial counsel was ineffective for failing to adequately investigate an alibi defense, as discussed more thoroughly in Parts III.B.4 and IV.B.1.b, infra.  A certificate of appealability will be denied as to all other grounds for relief.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.    Relevant Facts

The following is a summary of the facts underlying Petitioner's criminal case as summarized Pennsylvania Superior Court in its opinion affirming the denial of post-conviction relief pursuant the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. § 9541 et seq.[2]

> On September 22, 2008, at approximately 10:40 [p.m.], Korey Johnson [("Johnson" or "the victim")] drove into the Sunoco gas station/convenience store located on Penn Avenue in the Wilkinsburg section of Allegheny County. Johnson was accompanied by his girlfriend, Shermaine Campbell

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge on April 6, 2023. ECF Nos. 13 and 32.

[2] There are some procedural complexities in Petitioner's underlying state court proceedings that will be addressed in more detail in this Opinion to the extent necessary.  These include a first PCRA proceeding to reinstate direct appeal rights, a direct appeal docket number that was discontinued, and the fact that much of the substantive work during Petitioner's second PCRA proceeding was performed during a temporary remand to the trial court by the Superior Court.  See ECF No. 14 at 6-9, 15-21 (setting forth the procedural posture of Petitioner's state proceedings in detail).  For the sake of clarity, the undersigned notes that the relevant direct appeal of Petitioner's conviction and sentence was decided by the Superior Court at Case No. 128 WDA 2014.  Super. Ct. Op., ECF No. 14-1 at 306.  The relevant decision by the Superior Court in Petitioner's appeal from his PCRA proceedings was at Docket No. 1640 WDA 2017. PCRA Super. Ct. Op., ECF No. 14-2 at 546; Com. v. Engram, 248 A.3d 500 (Table), No. 1640 WDA 2017, 2021 WL 225631, at * 1-2 (Pa. Super. Ct. Jan. 22, 2021).

[("Campbell")], who was seated in the front passenger seat of Johnson's vehicle. Johnson was driving a rather distinctive purple GMC with heavily tinted windows. He stopped his vehicle at pump five with the driver's side facing Penn Avenue and Campbell's side facing the store itself. [This Sunoco has four dual-sided gasoline pumps, which are positioned in two rows of two. The row that is closest to the convenience store contains pumps one through four, and the row that is farther away from the convenience store, and closer to Penn Avenue (the "second row"), contains pumps five through eight. Pump five is located on the side of the second row that faces the convenience store.]

As [Johnson pulled into the gas station], [Engram] walked across Penn Avenue toward the gas pumps and pulled the hood of his sweatshirt over his head. [Engram] pulled a pistol from underneath his sweatshirt and walked directly to Johnson's side of the vehicle. [Engram] fired once through the driver's side window, which was up. He followed that initial shot with eight or nine more shots. The window did not shatter, but instead collapsed as one piece into the vehicle interior after the first shot. After the second shot, Campbell opened her door and crawled to the store to escape and request assistance.

City of Pittsburgh [P]olice [O]fficer William Wagner [("Officer Wagner")] was working a plainclothes detail inside the convenience store at the time and saw much of the event unfold. Officer Wagner immediately emerged from the store and pursued [Engram] as he fled back across Penn Avenue and behind a building. The foot pursuit ended abruptly when [Engram] "cut a corner," and fled down a side street out of Officer Wagner's sight.

... Medics arrived within minutes and attempted to keep Johnson alive for transport and treatment, but he was pronounced dead at the scene. Johnson was shot five times, suffering fatal [gunshot] wounds to the heart and lung. Ten 9mm casings were recovered at the scene[,] and it was determined that the casings were discharged from the same firearm.

Campbell, visibly shaken and upset, spoke to officers at the scene and stated that she "could not believe they shot him," and when asked specifically who shot Johnson, she responded "LL" three times. Campbell was taken to the homicide office[,] where she was formally interviewed and shown an eight person photo array. She immediately identified [Engram] as the shooter, writing on the array: "this is who I know as LL, this is who shot Korey."

3

> [Engram] was charged with criminal homicide, firearms not to be carried without a license, and possession of firearms prohibited; the charge of possession of [ ] firearm[s prohibited] was severed prior to trial and later withdrawn. On November 8, 2010, [Engram] proceeded to a jury trial before the Honorable Edward J. Borkowski and was convicted of both counts. [Engram] was sentenced to life imprisonment and a consecutive period of two to four years' imprisonment.

PCRA Super. Ct. Op., Com. v. Engram, 248 A.3d 500 (Table), No. 1640 WDA 2017, 2021 WL 225631, at * 1-2 (Pa. Super. Ct. Jan. 22, 2021), reargument denied (Apr. 1, 2021), appeal denied, 266 A.3d 450 (Pa. 2021) (brackets as in original).  See also ECF No. 14-2 at 546-48.

### B.    First Direct Appeal

Petitioner's initial direct appeal, docketed at 902 WDA 2011, was dismissed by the Superior Court on October 22, 2013, due to Petitioner's failure to file a brief.  ECF No. 14-1 at 141 (dated both June 25, 2013 and October 22, 2013).  See also Docket, Com. v. Engram, No. 902 WDA 2011 (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumbe r=902%20WDA%202011&dnh=XOrAfItYUYL4jgW0LAOtsQ%3D%3D (last visited Mar. 11, 2025)) (indicating that the appeal was dismissed on October 22, 2013).  Petitioner sought leave to reinstate his appellate rights on December 2, 2013, which was denied by the Superior Court without prejudice on December 11, 2013.  ECF No. 14-1 at 136, 142.

### C.    First PCRA Petition Reinstating Direct Appeal Rights

Petitioner filed an "Amended Post-Conviction Relief Act Petition" in the Court of Common Pleas of Allegheny County on December 20, 2013, seeking reinstatement of his direct appeal rights.  Id. at 143.  This first PCRA petition was granted by the trial court, and Petition ultimately was given 30 days from January 13, 2014, to file a direct appeal.  Id. at 153. Petitioner did so on January 21, 2014, which led to the direct appeal at Case No. 128 WDA 2014. Id. at 154, 162, 168.

**D.      Relevant Direct Appeal**

Petitioner's conviction and sentence were affirmed by the Pennsylvania Superior Court on direct appeal.  Com. v. Engram, 128 WDA 2014, 2015 WL 6167543, at *2 (Pa. Super. Ct. Apr. 28, 2015).  See also Super Ct. Op., ECF No. 14-1 at 306.  On direct appeal, the Superior Court addressed the following issues.

> I. WHETHER THE VERDICT IN THIS MATTER WAS AGAINST THE WEIGHT OF THE EVIDENCE[?]
>
> II. WHETHER THE VERDICT IN THIS MATTER WAS LEGALLY INSUFFICIENT TO SUSTAIN A CONVICTION OF MURDER IN THE FIRST DEGREE AND FIREARMS NOT TO BE CARRIED WITHOUT A LICENSE[?]
>
> III. WHETHER THE TRIAL COURT ERRED WHEN IT ALLOWED SERGEANT [CHARLES] HENDERSON TO TESTIFY ABOUT MS. CAMPBELL'S STATEMENTS TO THEM UNDER THE EXCITED UTTERANCE EXCEPTION TO THE HEARSAY RULE[?]

Id. at *2.

Petitioner timely sought leave to appeal his conviction to the Pennsylvania Supreme Court at Docket No. 204 WAL 2015.  The Pennsylvania Supreme Court denied allocatur on October 14, 2015.  ECF No. 14-1 at 383.  The docket for Case No. 204 WAL 2015 is available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=204%20WAL%202015&d nh=sRTSu5UpMN4YtNr939zJjg%3D%3D (last visited Mar. 11, 2025).

There is no indication on the record that Petitioner filed a petition for writ of certiorari with the United States Supreme Court with respect to his direct appeal.  As such, his conviction became final on January 12, 2016 – 90 days after allocatur was denied.  See U.S. Sup. Ct. R. 13; see also Jenkins v. Sup't of Laurel Highlands, 705 F.3d 80, 84 (3d Cir. 2013) ("On direct review, the Pennsylvania Supreme Court denied Jenkins's petition for allowance of appeal on September

28, 2007 . . . . Because Jenkins had ninety days to petition for certiorari to the United States Supreme Court, his conviction became final on December 27, 2007.").

E.    **Second PCRA Proceedings**

    1.    **Proceedings at the PCRA trial court**

Petitioner timely initiated his counseled second PCRA proceeding by filing an initial petition on November 21, 2016. ECF No. 14-1 at 384. Petitioner followed with an addendum to his PCRA petition on December 6, 2016, id. at 433, as well as a so-called "Amended and Supplemental Petition" on January 11, 2017, id. at 438.

On April 6, 2017, the PCRA trial court issued a Notice of Intention to Dismiss the PCRA proceeding without a hearing. Id. at 518. Petitioner responded to the Notice on April 25, 2017, in which he moved for leave to file another supplemental PCRA petition, in which he submitted even more claims. Id. at 522.

Taking into account each of Petitioner's filings to this point of his second PCRA proceeding collectively, Petitioner raised the following claims in his second PCRA proceeding as of April 25, 2017.

> 1. Trial counsel as ineffective for failing to request a curative instruction, or a mistrial on the basis that the prosecutor shifted the burden to produce evidence, thereby depriving petitioner of a fair and impartial trial. The prosecutor told the jury in opening remarks that a notice of alibi defense was filed two years after petitioner was arrested, and that the petitioner's mother was named as an alibi witness; however, petitioner did not present an alibi defense at trial, and the jury was not instructed that it could not draw an adverse inference from the failure to call alibi witnesses.
>
> 2. Trial counsel was ineffective for not filing a motion in limine, or moving to redact references in Shermaine Campbell's taped statement to an unrelated incident in which she asserts that Mr. Engram was a friend or associate of someone who allegedly shot at the victim on a prior occasion, at which time a young boy was killed.

6

3. Trial counsel was ineffective for not requesting that the jury be instructed that it should consider all facts and circumstances surrounding a witness's prior out-of-court statements, and evaluate whether the witness was confused, under duress, or burdened by threats or other improper influences in judging the witness's credibility and deciding whether to consider the prior statements as substantive evidence.

4. Trial counsel was ineffective for not moving to suppress port authority Sergeant William Wagner's in-court identification of the petitioner, Jesse Engram, as the shooter; alternatively, trial counsel was ineffective for not presenting the fact that Wagner did not identify Mr. Engram as the shooter until he was re-interviewed two years after the incident, and almost two weeks after the trial was originally schedules to commence, at which time the Commonwealth was well-aware that its two key witnesses were going to recant their prior statements to the police.

5. Trial counsel was ineffective for not objecting to the flight instruction.

6. Trial counsel was ineffective for failing to present a surveillance video from the gas station/scene of the crime, which denied Mr. Engram of a fair trial insofar as the video not only would have impeached the testimony of Commonwealth witnesses Wagner, Henderson and Trapp, but would have raised reasonable doubt as to Mr. Engram's guilt, and proven his actual innocence.

7[a]. The prosecution improperly commented on the weakness of the anticipated defense strategy in his opening remarks, which lead [sic] the jury to believe as the outset that the defense had the burden of proving the Defendant did not commit the crime, and that in fact, the defense could not meet that burden.

7[b]. Alternatively, counsel was ineffective [i] for failing to notify the court and the Commonwealth as the start of the trial that Mr. Engram was not pursuing an alibi defense, [ii] for failing to file a motion in limine to preclude reference to the videotape, and [iii] for failing to ascertain whether the Commonwealth was going to call Alfred Diggs.

8[a]. Counsel was ineffective [i] for not challenging Sergeant Wanger's in-court identification of Mr. Engram as the shooter by failing to elicit testimony from Wagner that he did not inform anyone that he could identify the shooter as Mr. Engram until almost two weeks after the trial was originally scheduled to

commence, at which point the Commonwealth was aware that its two key witnesses were going to recant; and [ii] by failing to cross-examine Wagner with regard to the fact that Wagner initially detained someone whom he believed was the shooter, but then released him upon being informed by a witness as the scene that the detained person was not the shooter.

9. Defendant's copy of a DVD of the surveillance video from the gas station/scene of the crime is submitted as an offer of proof in support of the claim presented; however, because it is unclear whether this copy is the same as the original and/or the commonwealth's copy of the video footage at issue, Mr. Engram seeks discovery of the original tape.

Id. at 389, 393, 397, 399, 406, 443, 447, 451, 453, 461, 463, 523, 526, and 529 (claims renumbered for clarity). In its Answer to Supplemental Post Conviction Relief Act Petition, the prosecution parsed claims 7-9 as follows:

A. Trial Counsel was ineffective for failing to notify the Court and the Commonwealth at the start of the trial that Mr. Engram was not pursuing an alibi defense.

B. Trial Counsel was ineffective for failing to file a Motion in Limine to preclude reference to the surveillance videotape.

C. Trial Counsel was ineffective for not ascertaining pretrial that the Commonwealth was not going to call Alfred Diggs.

D. Trial Counsel was ineffective for failing to cross-examine Sergeant Wagner about the events reported by Alfred Diggs.

E. Trial Counsel was ineffective for failing to file a Motion in Limine to exclude Wagner's identification of petitioner based on Diggs' statement to detectives.

F. Trial Counsel was ineffective for failing to call Diggs as a material witness in order to impeach Sergeant Wagner's credibility.

Id. at 556 (renumbered for clarity).

The PCRA trial court issued another Notice of Intention to Dismiss on August 30, 2017, parsing Petitioner's newly-asserted second set of supplemental claims as six distinct ground for

relief.  Id. at 578.  Petitioner did not respond to this second notice, and the PCRA trial court issued an order denying PCRA relief without a hearing on October 5, 2017.  Id. at 581.

## 2.    Appeal and temporary remand

Petitioner timely appealed the denial of PCRA relief on November 2, 2017.  Id. at 582. Petitioner moved to represent himself on appeal, and the Superior Court remanded the case to the trial court for a hearing on whether he might do so pursuant to Commonwealth v. Grazier, 713 A.2d 81 (Pa. 1998).  Id. at 604, 611.  Prior to the hearing, on December 22, 2017, Petitioner's then-PCRA counsel moved to withdraw.  Id. at 613.  Counsel was allowed to withdraw during the Grazier hearing held on February 22, 2018.  Hr'g Tr. dated Feb. 22, 2018, at 8.  Petitioner requested the appointment of new counsel at the hearing, id. at 7.  New counsel was appointed on March 7, 2018.  ECF No. 14-1 at 617.

On June 15, 2018, the Superior Court again temporarily remanded the case to the PCRA trial court so Petitioner, represented by new counsel, could respond to the trial court's second Notice of Intention to Dismiss.  Id. at 618, 626.  After extensions of time, the appointment of an investigator, and the approval of funds, id. at 627, 638, 646, 655, Petitioner filed a response to the PCRA trial court's two Notices of Intention to Deny.  Id. at 656.  In that filing, Petitioner raised claims of ineffective assistance of prior PCRA counsel.  Id. at 659.

Petitioner sought to extend the remand period on December 14, 2018, which was granted by the Superior Court on December 19, 2028.  ECF No. 14-2 at 1, 4.  Thereafter, Petitioner sought discovery,[3] id. at 5, filed a motion for additional time to submit an amended response to

---

[3] In his motion for discovery with the PCRA trial court, Petitioner sought, *inter alia*, additional video evidence from the murder scene, as well as evidence related to the investigation of the existence of video surveillance, and how the single existing video from the night of the murder came into police custody.  ECF No. 14-2 at 5, 10-14.
(continued . . . .)

the Notices of Intention to Dismiss, id. at 22, a motion for additional funds for an investigator, id.

at 27, and another extension of time to file an amended response to the Notices of Intent to

Dismiss., id. at 39.

Petitioner ultimately filed his Amended Response to Notices of Intent to Dismiss PCRA

Petition and Amended Claims of PCRA Ineffectiveness on April 11, 2019. ECF No. 14-2 at 45.

In it, Petitioner asserted the following claims.

> I. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
> SEEK TO BAR FROM EVIDENCE SHERMAINE
> CAMPBELL'S OUT-OF-COURT STATEMENT SPECULATING
> THAT THE MOTIVE FOR THE SHOOTING ORIGINATED
> WITH THE HOMICIDE OF A 12-YEAR OLD BOY THAT HAD
> OCCURRED SIX MONTHS EARLIER. (Amended PCRA –
> SECTION III).
>
> II. CLAIMS RELATED TO THE DOUBTFUL CREDIBILITY
> OF PROSECUTION WITNESS WILLIAM WAGNER.
>
> A. Trial Counsel Was Ineffective for Not Moving to Suppress
> William Wagner's In-Court Identification on Grounds of
> Suggestiveness. (Amended PCRA at 16-23).

---

The PCRA trial court granted discovery in part, but limited it to "pre-trial discovery in this
matter." Id. at 26. Additionally, the PCRA trial court ordered that "the [prosecution] is not
required to affirm in writing which items do not exist as requested by petitioner. Further, the
Commonwealth is not required to produce any documents that would be protected under attorney
client privilege, attorney work product, and the Criminal Records History Information Act." Id.

Petitioner supplemented his discovery motion, again asking for evidence related to video
surveillance on the night of the murder after the prosecution declined to provide the information
without a court order. Id. at 149-50, 156, and 160; see also id. at 243-45.

The PCRA trial court held oral argument on May 21, 2019, during which the prosecutor asserted
that no additional video evidence existed. PCRA Hr'g Tr. dated May 21-23, 2019, ECF No. 7-2
at 21. The record does not indicate that the prosecution presented any evidence in order to
support this argument. The PCRA trial court apparently took the prosecutor at his word, and
refused to allow Petitioner's counsel to interview police witnesses regarding custody of the video
evidence based on the age of the case. Id.

B. Where Sergeant Wagner Ambushed the Defense by Disclosing for the First Time During Trial That He Had Made a Previous Identification of Mr. Engram, Trial Counsel Was Ineffective for Failing to Seek a Mistrial or Take Other Remedial Action. PCRA Counsel Was Ineffective for Failing to Raise this Claim Previously. (Claim Not Previously Raised).

C. Trial Counsel Was Ineffective in Failing to Challenge Wagner's False Testimony That it Was an Unseasonably Hot Night Which Was the Basis for His Claim That He Paid Especial Attention to the Shooter Who Was Wearing a Hooded Sweatshirt. PCRA Counsel Was Ineffective for Failing to Raise this Claim. (Claim Not Previously Raised).

D The Prosecution Knowingly Used False Evidence to Convict Jesse Engram, Thereby Denying Him a Fundamentally Fair Trial. To the Extent this Claim Is Subject to Bars of Waiver and Procedural Default, Prior Counsel Were Ineffective for Failing to Preserve It. (Claim Not Previously Raised).

III. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO EVIDENCE AND ARGUMENT THAT WITNESSES DECLINED TO IDENTIFY THE DEFENDANT BECAUSE THEY HAD FELT INTIMIDATED WHERE THERE WAS NO EVIDENCE OF THAT THE DEFENDANT HAD ANY INVOLVEMENT IN ANY INTIMIDATION. FURTHER, PCRA COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM OF TRIAL INEFFECTIVENESS. (Claim Not Previously Raised).

IV. CLAIMS RELATED TO THE SURVEILLANCE VIDEOTAPE.

***

B. Trial Counsel Was Ineffective for Failing to Present a Surveillance Video from the Gas Station/Scene Of the Crime, Which Denied Mr. Engram of a Fair Trial Insofar as the Video Not Only Would Have Impeached the Testimony of Commonwealth Witnesses Wagner, Henderson and Trapp, but Would Have Raised Reasonable Doubt as to Mr. Engram's Guilt, and Proven His Actual Innocence. (Amended PCRA Petition, Section Claim VII).

C. Mr Engram's Rights to Due Process Have Been Violated by the Failure to Disclose All Video Recordings Taken by the Several Cameras in Operation at the Sunoco A-plus Station Which

Captured Images of the Activities That Transpired at the Gas Pumps and Inside the Convenience Store.

D. Trial Counsel Was Ineffective for Not Obtaining an Expert to Examine the Surveillance Video. PCRA Counsel Was Likewise Ineffective for Failing to Retain an Expert. (Claim Not Previously Raised).

V. CLAIMS RELATED TO ALIBI.

A. Trial Counsel Was Ineffective for Failing to Seek a Remedy for the Prosecutor's Comment in Opening Statement about the Date of the Filing of the Notice of Alibi to Imply That the Alibi Defense Was Concocted Many Months after the Shooting. (Amended PCRA Section II).

B. Trial Counsel Was Ineffective for Failing to Notify the Prosecution Before Trial That the Defense Was Withdrawing the Alibi. (Second Supplemental PCRA Petition at 8-9).

C. Trial Counsel and PCRA Counsel Were Ineffective for Failing to Adequately Investigate Petitioner's Alibi Defense. (Claim Not Previously Raised).

D. PCRA Counsel Was Ineffective for Failing to Adequately Investigate and Plead the Claim That Petitioner Did Not Make a Knowing and Intelligent Waiver of His Alibi Defense. (Claim Not Previously Raised).

VI. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO A VAGUE OUT-OF-COURT IDENTIFICATION BY HAROLD FIELDS ON GROUNDS THAT THE PROBATIVE VALUE OF THE EVIDENCE WAS SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE AND THAT IT WAS BEING INTRODUCED MERELY AS A PRETEXT FOR PUTTING BEFORE THE JURY UNPROVEN INNUENDO OF WITNESS INTIMIDATION. FURTHER, PCRA COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THIS CLAIM OF TRIAL INEFFECTIVENESS. (Claim Not Previously Raised).

VII. TRIAL COUNSEL WAS INEFFECTIVE FOR COMMENTING IN OPENING STATEMENT THAT A MAN NAMED ALFRED DIGGS WAS GOING TO IDENTIFY MR. ENGRAM AS THE SHOOTER. DESPITE THE FACT THAT THE PROSECUTION HAD NOT MENTIONED DIGGS IN OPENING STATEMENT AND WITHOUT FIRST ASCERTAINING WHETHER THE PROSECUTION WAS

GOING TO CALL ALFRED DIGGS. (Second Supplemental PCRA Petition at 4).

VIII. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO DEMAND THE PRESENCE OF A COURT REPORT TO TRANSCRIBE JURY SELECTION. FURTHERMORE, MR. ENGRAM WAS DENIED HIS FUNDAMENTAL RIGHT TO AN UNBIASED JURY COMPOSED OF A FAIR CROSS SECTION OF THE COMMUNITY. PRIOR PCRA COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE THIS CLAIM. (Claim not Previously Raised).

IX. THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED MR. ENGRAM OF HIS DUE PROCESS RIGHTS TO A FAIR TRIAL AND TO EFFECTIVE ASSISTANCE OF COUNSEL.

Id. at 46-48 (cleaned up, parentheticals as in the original). According to Amended Response, this was the first time that claims II.B, II.C, II.D, III, IV.D, V.C, V.D, VI, and VIII were raised in the PCRA proceeding. It also is noteworthy that Claim II.D – relating to the use of allegedly false evidence and ineffective assistance of counsel related to the same – included arguments that Sergeant Wagner allegedly fabricated his identification of Petitioner, but did not include any argument related to allegedly deceptive photographs, as asserted in Ground Five of the instant federal habeas Petition. Id. at 845-46.

The PCRA trial court set an evidentiary hearing, which took place on May 21 and 23, 2019. PCRA Hr'g Tr. dated May 21-23, 2019, ECF No. 7-2 at 1. The prosecution filed an answer to Petitioner's amended PCRA claims May 20, 2019 – a day before the hearing commenced. ECF No. 14-2 at 181.

### 3.    The PCRA reply brief and PCRA appeal

Petitioner filed a reply brief on August 5, 2019 – 75 days after the hearing. Id. at 251. In the reply brief, Petitioner once again asserted Claim II.D – namely, that:

The Prosecution Knowingly Used False Evidence to Convict Jesse Engram, Thereby Denying Him a Fundamentally Fair Trial. To the

> Extent this Claim Is Subject to Bars of Waiver and Procedural
> Default, Prior Counsel Were Ineffective for Failing to Preserve
> It[.]

Id. at 252.    The argument in the reply brief largely related to Sergeant Wagner's testimony

without mention to photographs.  Id. at 277-79.  The only mention of photographs in this claim is

as follows:

> Finally, counsel intends to raise an additional claim that the
> prosecution used false or misleading testimony, pending
> consultation with an expert about the fifty JPG photos taken by
> Canofari and Stadtmiller on August 10, 2010; three of which were
> shown to the jury. *See* Preliminary Statement, *supra*. Counsel
> anticipates that this will corroborate that the prosecution's use of
> false and misleading testimony was knowing.

Id. at 279 (emphasis as in original).  In the preliminary statement section mentioned in the claim,

Petitioner stated the following:

> Counsel intends to file a supplemental claim based on Petitioner's
> Exhibit 26, which is a compact disk containing 50 photographs in
> JPG format. This exhibit was discussed in Petitioner's Addendum
> to Motion for Ruling on Pending Requests for PCRA Discovery,
> filed May 20, 2019. The disk itself was submitted to the clerk in
> open court on May 21, 2019, and is identified as Pet. Ex. 26. After
> careful comparison of the JPG files with the Commonwealth's trial
> exhibits, counsel has determined that three of the JPG photographs
> were introduced into evidence by the Commonwealth without
> objection at trial, as Exhibits 6, 15, and 16. Pet. Ex. 29. The jury
> was not informed of the date or time that the photographs were
> taken. However, Detective Canofari testified that he took the
> photos during daylight hours at the crime scene, and that trial
> prosecutor Stadtmiller posed in the photos. TT at 45, 160-61. Data
> on the disk indicate that the photos were taken on August 10, 2010,
> from 11:06 a.m. to 11:16 a.m.
>
> At the recent hearing, prior PCRA counsel, Suzanne Swan, esq.,
> testified that she did not receive the actual trial exhibits, so she did
> not compare the trial exhibits to the raw disclosures to the defense,
> which included the disk of 50 daylight photos. NT 5/23/2019 at
> 169-70, 172. *See also* Pet. Ex. 25 at ¶ 4.

> Counsel has concluded that Commonwealth's Trial Exhibits 6, 15, and 16 should have been barred from evidence because they lacked a sufficient foundation, and were prejudicial and misleading. The photos and the testimony associated with the photos were intended to deceive the jury on the critical question of William Wagner's opportunity to view the offender. Counsel intends to file a supplemental claim challenging the use of these misleading photos, framed as prosecutorial misconduct and ineffective assistance of prior counsel. Counsel is attempting to identify an appropriate expert to assist in analyzing the relevant data on the disk of 50 JPG files. Once an appropriate and available expert is identified, counsel will petition the court for expert funding if necessary.

Id. at 256-57 (emphasis in original).

In the "Conclusion and Prayer for Relief" section of the reply brief, Petitioner asks that "[t]he court permit the filing of further pleadings as set forth in the Preliminary statement[,]" but does not file a formal motion for leave to amend, or a motion for extension of time to do so. Id. at 302.

The Superior Court again extended Petitioner's remand period on Petitioner's motion on September 8, 2019. Id. at 356.

Petitioner sought additional funds for an investigator on October 28, 2019. Id. at 357. In this motion, Petitioner once again mentioned his intention to file another supplemental claim regarding the photographs, but did not request funds for obtaining a related expert.

> 10. Crime Scene: As mentioned in a prior pleading, Petitioner intends to file a Supplemental Claim alleging that Commonwealth's Trial Exhibits 6, 15, and 16, were prejudicial and misleading and used to deceive the jury. See Reply to Commonwealth's Answer at 1-2 (filed August 2, 2019). Counsel is consulting with an expert in digital photography who is examining these exhibits. *At this time, the expert is assisting at no cost and counsel is not presently requesting expert funding.* However, to assist the expert, counsel is attempting to obtain additional information about the crime scene which requires additional investigation resources, due in part to the lack of cooperation by the owner of the premises. Pet. Ex. 21 at ¶ 8.c.

Id. at 359 (bolded, italic emphasis added; all other emphasis as in original).   There is no indication on the record that the PCRA trial court ever ruled on this motion for additional funds.

The Superior Court extended the remand period for 90 days one final time on December 10, 2019.   See Docket, Com. v. Engram, No. 1640 WDA 2017 (available at https://ujsportal.pacourts.us/Report/PacDocketSheet?docketNumber=1640%20WDA%202017& dnh=fQzNY6rlvYnsRp78jiqpQQ%3D%3D (last visited Mar. 11, 2025)).

Ultimately, post-conviction relief was denied by the PCRA trial court on January 10, 2020.   ECF No. 14-2 at 370.   This was 232 days after the conclusion of the PCRA hearing, 158 days after the filing of Petitioner's post-hearing reply brief in which he indicates that he intends to file an additional supplemental claim regarding allegedly deceptive photographs, and 75 days after Petitioner filed his motion for additional funds.   At no point on the record before this Court does Petitioner actually submit such a claim, or move for an extension of time to do so.   The closest to such a motion on the record is Petitioner's prayer for relief in his reply brief.   Id. at 302.

The record does not indicate that the PCRA trial court issued any opinion explaining its reasoning for denying relief after the remand.   Nor does it appear that a concise statement of errors pursuant to Pa. R.A.P. 1925(b) was ordered by the PCRA trial court.

After relief was denied in the PCRA trial court, jurisdiction was returned to the Superior Court.   Id. at 371.   Petitioner submitted his initial brief on appeal on May 1, 2020.   Id. at 374.   In that brief, Petitioner raised eight grounds for relief.   Id. at 381.   Relevant to this Opinion are Issue Nos. 4, 5, and 8.

> 4. Whether trial counsel ineffectively failed to attack testimony of William Wagner by (a) moving to suppress his suggestive identification, (b) disproving Wagner's testimony that the shooter was dressed suspiciously causing Wagner to keenly focus on his

face, and (c) taking remedial action when Wagner testified for the first time at trial that he had made a prior identification of Mr. Engram.

5. Whether the prosecution knowingly used false evidence against Mr. Engram which trial counsel ineffectively failed to correct.

\*\*\*

8. Whether the remand proceedings were fundamentally unfair.

Id. at 381-82. In the argument section of the brief, Petitioner's arguments regarding the allegedly deceptive photographs were raised at Issue No. 5. No arguments with respect to the photos were raised in Issue No. 4, which instead focused on the content of Wagner's testimony and other issues, such as surveillance video that provides the basis for Ground Two of the instant federal habeas Petition. Id. at 416-433.

In opposition, the prosecution argued that Issue No. 5 was waived because it was not submitted to the PCRA trial court. Id. at 451, 467.

Petitioner filed a reply brief in which he explicitly kept his arguments as to Issue No. 4 and Issue No. 5 separate, and did not include arguments about allegedly deceptive photographs in Issue No. 4. Id. at 527-36. Additionally in the reply brief, Petitioner explicitly addressed the waiver of the deceptive photograph argument at the PCRA trial court as part of Issue No. 8. Id. at 534-36. At Issue No. 8, Petitioner generally argued about the purpose of the remand to the PCRA trial court (which was to respond to the second Notice of Intention to Dismiss), as well as the futility of moving to reconsider in the PCRA trial court. Id. at 540-42.

The Superior Court affirmed the denial of post-conviction relief on January 22, 2021. Engram, 2021 WL 225631, at *1. In its order, the Superior Court addressed the following eight issues.

1. Whether [trial counsel] ineffectively failed to investigate and present [Engram's] alibi, and failed to prevent [the] jury from drawing adverse inferences from the omission of [the] alibi[?]

2. Whether [trial counsel] ineffectively failed to introduce an exculpatory surveillance videotape[?]

3. Whether [trial counsel] ineffectively failed to object to unfounded speculation that [ ] Engram was associated with a prior murder[?]

4. Whether [trial counsel] ineffectively failed to attack the testimony of [Officer] Wagner by (a) moving to suppress his suggestive identification, (b) disproving [Officer] Wagner's testimony that the shooter was dressed suspiciously causing [Officer] Wagner to keenly focus on his face, and (c) taking a remedial action when [Officer] Wagner testified for the first time at trial that he had made a prior identification of [ ] Engram[?]

5. Whether the prosecution knowingly used false evidence against [ ] Engram[,] which [trial counsel] ineffectively failed to correct[?]

6. Whether [trial counsel] ineffectively told the jury that a non-testifying witness identified [ ] Engram[?]

7. Whether cumulative prejudice deprived [ ] Engram of a fair trial[?]

8. Whether the remand proceedings were fundamentally unfair[?]

Id. at *2-3.

The Superior Court held that Issue Nos. 5 and 8 were waived.[4] Id. at *7-8. Reargument was denied on April 1, 2021. ECF No. 14-2 at 613.

The Pennsylvania Supreme Court denied *allocatur* on November 3, 2021. Com. v. Engram, 266 A.3d 450 (Pa. 2021) (table).

---

[4] Petitioner disputes that Issue No. 5 on PCRA appeal was waived. ECF No. 18 at 16. For the reasons that follow, he is incorrect.

## II.    FEDERAL HABEAS PETITION

Petitioner initiated this counseled federal habeas action on December 20, 2021 with the filing of the Petition.  ECF No. 1.  Petitioner also filed a supporting brief on March 24, 2022.  ECF No. 12.  Respondents answered the Petition on May 20, 2022.  ECF No. 14.  Petitioner timely filed a Traverse to Respondents' Answer on July 5, 2022.  ECF No. 18.

In the pending Petition, Petitioner asserts the following grounds for relief.

Ground One:    Trial counsel ineffectively failed to properly investigate Petitioner's alibi defense, and then, when his inadequate investigation convinced counsel not to present the defense, he ineffectively failed to withdraw it prior to trial.  ECF No. 1 at 19.

Ground Two:    Trial counsel failed to introduce exculpatory surveillance video of the crime rendering him ineffective under the sixth and fourteenth amendments of the united states constitution.  Id. at 23.

Ground Three: Trial counsel failed to object to the introduction of speculative and hearsay motive evidence that was unduly prejudicial.  Id. at 27.

Ground Four:    The prosecutor knowingly used false evidence when it failed to correct police testimony that was offered to bolster deficiencies in the police investigation, in violation of the due process clause -- trial counsel ineffectively failed to object.  Id. at 30.

Ground Five:    Officer Wagner also fabricated his identification in violation of due process of law.  Id. at 34.  Petitioner amends this claim in his supporting brief to add that "[trial] counsel ineffectively failed to challenge this fabrication."  ECF No. 12 at 40.  He did not file an amended petition to reflect this change.

Ground Six:    The prosecution failed to disclose the available video footage of the shooting, when such footage would have proven exculpatory.  ECF No. 1 at 39.

In his supporting brief, Petitioner narrows Ground Four to withdraw his assertion that the prosecution "elicited false testimony to explain why photo arrays were not shown to various witnesses."  ECF No. 12 at 32 n.6.

Additionally, on March 30, 2023, this Court granted Petitioner's request for limited discovery in this case relating to allegedly suppressed video footage.  ECF Nos. 31 and 35.  See also ECF No. 31 at 12 (finding that the existence of favorable discovery may be relevant to Grounds Five and Six of the Petition).  Petitioner further was granted leave to conduct limited depositions.  ECF No. 53.  On April 29, 2024, Petitioner was given permission to expand the record, pursuant to Rule 7 of the Rule Governing Section 2254 Cases, with the transcripts of the depositions that he was permitted to take as part of habeas discovery, as well as a City of Pittsburgh Bureau of Police Supplemental Report, dated April 21, 2010, detailing the police departments' processing of surveillance video from the murder scene.  ECF Nos. 65 and 66.  No suppressed video footage was revealed through discovery.

Petitioner submitted a supplemental Traverse on May 13, 2024, incorporating the new discovery into his arguments in support of Grounds Five and Six of the Petition.  ECF No. 68.

With the completion of the permitted discovery and the filing of Petitioner's supplemental Traverse, the Petition is ripe for adjudication.

## III.    PROCEDURAL ISSUES

Before this Court addresses the merits of Petitioner's federal habeas claims, it will address whether the Petition fulfills the applicable procedural requirements, as set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").

### A.    The AEDPA Statute of Limitations

The first consideration in reviewing a federal habeas corpus petition is whether the petition was timely filed within the applicable statute of limitations.  In 1996, Congress enacted the AEDPA, which generally established a strict one-year statute of limitations for the filing

habeas petitions pursuant to 28 U.S.C. § 2254.  The applicable portion of the statute is as

follows:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

The United States Court of Appeals for the Third Circuit has held that the statute of

limitations set out in Section 2244(d) must be applied on a claim-by-claim basis.  Fielder v.

Varner, 379 F.3d 113, 122 (3d Cir. 2004), cert. denied sub nom. Fielder v. Lavan, 543 U.S. 1067

(2005).  Thus, in analyzing whether a petition for writ habeas corpus has been timely filed under

the one-year limitations period, a federal court must undertake a three-part inquiry.  First, the

court must determine the "trigger" date for the individual claims raised in the petition.

Typically, this is the date that the petitioner's direct review concluded and the judgment became "final" for purposes of triggering the one-year period under Section 2244(d)(1)(A). Second, the court must determine whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute pursuant to Section 2244(d)(2). Third, the court must determine whether any of the other statutory exceptions or equitable tolling should be applied on the facts presented. See, e.g., Munchinski v. Wilson, 807 F. Supp. 2d 242, 263 (W.D. Pa. 2011), aff'd, 694 F.3d 308 (3d Cir. 2012) (citing Nara v. Frank, No 99-5, 2004 WL 825858, at *3 (W.D. Pa. Mar. 10, 2004)).

In their Answer, Respondents concede that the Petition is timely under the applicable statute of limitations. ECF No. 14 at 32. A review of the record, as set forth above, supports this conclusion. Therefore, Petitioner's claims are timely filed.

### B.    Exhaustion and Procedural Default

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state prisoner to exhaust available state court remedies before seeking federal habeas corpus relief. In order to exhaust a claim, "a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." McCandless v. Vaughn, 172 F.3d 255, 260-61 (3d Cir. 1999). Moreover, a petitioner must present every claim raised in the federal habeas petition to the state's trial court, intermediate appellate court, and highest available court before exhaustion will be considered satisfied. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004). In Pennsylvania, petitioners afford the state courts that opportunity by fairly presenting their claims to the trial court and to the Superior Court, either on direct review or on

appeal of a petition for relief under the PCRA.  Lambert, 387 F.3d at 232-34; see also Rodland v. Sup't of SCI Houtzdale, 837 F. App'x 915, 919 (3d Cir. 2020).

A petitioner shall not be deemed to have exhausted state remedies if he has the right to raise his claims by any available state procedure.  28 U.S.C. § 2254(c).  The petitioner has the burden of establishing that the exhaustion requirement has been met.  Ross v. Petsock, 868 F.2d 639, 643 (3d Cir. 1989); O'Halloran v. Ryan, 835 F.2d 506, 508 (3d Cir. 1987).  In the case at issue, it is clear that Petitioner's claims are exhausted at the state court level at the very least in the sense that there is no state avenue for relief available to him due to the PCRA's one-year statute of limitations.  See 42 Pa. C.S.A. § 9545(b).

However, beyond the question of exhaustion, a federal court may be precluded from reviewing habeas claims under the "procedural default doctrine."  Gray v. Netherland, 518 U.S. 152, 162 (1996); Coleman v. Thompson, 501 U.S. 722, 732 (1991); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir. 1996) (abrogated on other grounds by Beard v. Kindler, 558 U.S. 53, 60-61 (2009)); Sistrunk v. Vaughn, 96 F.3d 666, 675 (3d Cir. 1996).  This doctrine is applicable where, inter alia, a petitioner's claims are "deemed exhausted because of a state procedural bar[.]" Lines v. Larkin, 208 F.3d 153, 160 (3d Cir. 2000).  Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system and, in turn, it is based upon the "independent and adequate state law grounds" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment.  Coleman, 501 U.S. at 750.

The PCRA's one-year statute of limitations has been held to be an "independent and adequate" state law ground for denying habeas relief.  Whitney v. Horn, 280 F.3d 240, 251 (3d

Cir. 2002). So too has the requirement under 42 Pa. C.S.A. § 9544(b) that "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding." Garcia v. Adams, No. 17-CV-5249, 2019 WL 8015127, at *6 (E.D. Pa. Aug. 27, 2019), report and recommendation adopted, 2020 WL 868200 (E.D. Pa. Feb. 20, 2020), aff'd sub nom. Garcia v. Sup't Forest SCI, No. 20-1570, 2022 WL 1153122 (3d Cir. Apr. 19, 2022) (citing cases). Additionally, waiver due to a petitioner's failure to recite a claim in a statement of questions section in his state court appeal brief has been held to be independent and adequate ground for procedural default Stringer v. Folino, No. 13-221, 2016 WL 836347, at *13-14 and n.16 (W.D. Pa. Feb. 1, 2016) (citing Pa. R.A.P 2116(a)), report and recommendation adopted, 2016 WL 826016 (W.D. Pa. Mar. 3, 2016).

Here, Petitioner concedes that Grounds Four and Six are not exhausted and are procedurally defaulted, but argues that the default should be forgiven under the doctrine of "fundamental miscarriage of justice" due to his alleged actual innocence.[5] ECF No. 1 at 18.

Respondents also agree that Grounds Four and Six are defaulted. Id. at 36. Additionally, they argue that portions of Grounds One and Five are defaulted as well. Id. at 36, 40, and 73. Specifically, Respondents argue that the portion of Ground One seeking relief due to trial counsel's failure to withdraw the Notice of Alibi, and the portion of Ground Five relating to the submitting of fabricated testimony and deceptive photographs, are procedurally defaulted. Id. at 40, 73.

---

[5] In his Traverse, Petitioner argues that the default of Ground Four also should be excused pursuant to Martinez v. Ryan, 566 U.S. 1 (2012). ECF No. 18 at 15. In Martinez, the United States Supreme Court held that the negligence of the prisoner's state post-conviction counsel can furnish cause to excuse procedural default of a claim of ineffective assistance of trial counsel if state post-conviction proceedings provide the first opportunity to raise such a claim. Martinez, 566 U.S. at 17.

In his Traverse, Petitioner argues that, because the failure to withdraw the Notice of Alibi portion of Ground One was argued in his brief in his PCRA appeal, it was not defaulted. ECF No. 18 at 5 (citing Petitioner's Br. on Ap., ECF No. 14-2 at 398); but see ECF No. 14-2 at 381 (Petitioner's "Statement of Questions Involved," which states Issue No. 1 on appeal to be "Whether trial counsel ineffectively failed to investigate and present alibi, and failed to prevent jury from drawing adverse inferences from the omission of alibi.").

Petitioner similarly argues in his Traverse that Ground Five was fully exhausted because he had to raise the ineffective assistance of counsel claim in tandem with the due process claim, and that Pennsylvania law afforded him his first opportunity to do so in his PCRA petition. ECF No. 18 at 16. Specifically, Petitioner argues that, "Because trial counsel was also direct appeal counsel, and he would have had to claim his own ineffectiveness since he failed to object at trial, [trial counsel] Attorney Jobe could not raise this ground on direct appeal." Id.

### 1.      Ground One is partially defaulted.

Respondents argue that the portion of Ground One seeking relief due to trial counsel's failure to withdraw the Notice of Alibi, is procedurally defaulted. ECF No. 14 at 40.

In his Traverse, Petitioner argues that, because the failure to withdraw the Notice of Alibi portion of Ground One was argued in his PCRA appeal brief, it was not defaulted. ECF No. 18 at 5 (citing Petitioner's Br. on Ap., ECF No. 14-2 at 398).

Petitioner's Issue No. 1 of his PCRA appeal brief was recited in the "Statement of Questions Involved" section as "Whether trial counsel ineffectively failed to investigate and present alibi, and failed to prevent jury from drawing adverse inferences from the omission of alibi." ECF No. 14-2 at 381. It does not state that trial counsel was ineffective for failing to withdraw the Notice of Alibi, as required by Pa. R.A.P 2116(a), despite the fact that the issue of

withdrawing the Notice of Alibi is discussed in the body Petitioner's appeal brief. ECF No. 14-2 at 398, 402-03. Petitioner's failure to do this was not a "fair presentation" of any claim predicated on trial counsel's failure to withdraw the alibi defense, and precluded the Superior Court from addressing this portion of the claim. Stringer, 2016 WL 836347, at *13-14 and n.16. Indeed, the Superior Court addressed the "adverse inference from the omission of alibi" portion of the claim – which actually was presented as required by state law. Engram, 2021 WL 225631, at *4-5. This portion of Ground One is procedurally defaulted.

The remainder of Ground One was exhausted, and will be addressed on the merits.[6]

### 2.    Ground Five is partially defaulted.

Respondents argue that a portion of Ground Five is defaulted, as follows:

> the issues regarding the allegation that the Commonwealth violated Petitioner's due process rights by submitting fabricated testimony and deceiving photographs is unexhausted and procedurally defaulted as the Pennsylvania Superior Court determined that the issue had been waived.

ECF No. 14 at 73. This is consistent with the Superior Court's refusal to address that portion of the claim in corresponding Issue No. 5 on appeal.

> In his fifth claim, Engram claims that his right to due process under the Sixth and Fourteenth Amendments to the United States Constitution was violated when the Commonwealth knowingly submitted as evidence fabricated testimony and deceiving photographs of the crime scene. *See* Brief for Appellant at 46-54.

---

[6] Petitioner claims that the Superior Court found that his ineffective assistance claim based on trial counsel's failure to investigate his alibi was waived. ECF No. 12 at 26. Not so. In its memorandum affirming the denial of post-conviction relief, the Superior Court found that Petitioner's waiver was of a related argument that his ***initial PCRA counsel was ineffective*** for not raising the failure to investigate claim in the PCRA petition – not trial counsel. Engram, 2021 WL 225631, at *5 and n.1 (citing page 22 of Petitioner's appeal brief, available at ECF No. 14-2 at 472). See also ECF No. 14-2 at 473. Respondents concede that the failure to investigate claim was exhausted, ECF No. 14 at 40, as they must, because the Superior Court clearly addressed it on the merits. Engram, 2021 WL 225631, at *2-4.

Engram states that the Commonwealth presented Officer Wagner's testimony, which identified Engram as the shooter, knowing that Officer Wagner was lying. *Id.* at 46. Engram further claims that the Commonwealth knowingly introduced certain photographs of the scene of the crime, with the intention of deceiving the jury. *Id.* at 47-54. Engram argues that the Commonwealth took the photographs during the daytime, when the shooting took place at night, and used magnifying lenses to make pump five look closer to the convenience store than it really was. *Id.*

Here, Engram did not raise this claim on direct appeal. *See* 42 Pa.C.S.A. § 9544(b) (stating that "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding."); *see also Commonwealth v. Sarvey*, 199 A.3d 436, 446 (Pa. Super. 2018) (stating that the appellant waived his PCRA claim of a violation of his due process rights where the appellant failed to raise it on direct appeal). Accordingly, this claim is waived.

Engram, 2021 WL 225631, at *7. The parties appear to agree that the Superior Court addressed the ineffectiveness portion of Ground Five – presumably when it addressed Issue No. 4 on appeal, in which Petitioner asserted that trial counsel was ineffective for failing to object to Sergeant Wagner's testimony. ECF No. 14 at 73; ECF No. 12 at 41. See also Engram, 2021 WL 225631, at *7.

Petitioner argues that "[b]ecause trial counsel was also direct appeal counsel, and he would have had to claim his own ineffectiveness since he failed to object at trial, [trial counsel] Attorney Jobe could not raise this ground on direct appeal." ECF No. 18 at 16. This argument makes little sense when applied to the direct Due Process claim, however. While it is true that Pennsylvania law requires an assertion of ineffective assistance of counsel to be raised in a PCRA proceeding, Com v. Grant, 813 A.2d 726, 738 (Pa. 2002), that simply has no bearing on the underlying Due Process claim that comprises this portion of Ground Five. Further, despite Petitioner's assertion that trial counsel – Mr. Jobe – represented Petitioner on direct appeal, the

state court record says otherwise.  See ECF No. 14-1 at 155 (Petitioner's notice of direct appeal, which resulted in Case No. 124 WDA 2014, signed by Christy P. Foreman – not Mr. Jobe).

The direct Due Process claim portion Ground Five is procedurally defaulted.

However, this does not reflect the full default of Ground Five, as it is presented in the Petition.  That is because Petitioner attempts to bootstrap an ineffective assistance of counsel claim with respect to allegedly deceptive photographs presented at trial by the prosecution as part of the attack on trial counsel's effectiveness with respect to Sergeant Wagner's testimony.  ECF No. 1 at 34-39; ECF No. 12 at 40-42; ECF No. 18 at 18-20.  Respondents, for their part, do not appear to assert that this argument is procedurally defaulted.[7]  ECF No. 14 at 78.

But this issue was never considered by the Superior Court.  As is more fully stated in Part I.E.3, supra, the issue of the trial counsel's ineffectiveness with respect to Sergeant Wagner's testimony and the allegedly deceptive photographs were presented separately as Issue No. 4 and Issue No. 5, respectively.  Argument with respect to the allegedly deceptive photographs never was presented as part of Issue No. 4, but only as part of Issue No. 5.  And the Superior Court, in addressing each Issue on appeal, explicitly cited to separate portions of Petitioner's appeal brief when addressing those claims.  Engram, 2021 WL 225631, at *7.  Thus, it is apparent, after reviewing the state court record – and particularly the documents discussed in Part I.E.3., supra, that the Superior Court's ruling on the merits of Issue No. 4 did not include an analysis of the allegedly deceptive photographs raised at Issue No. 5.

---

[7] Although this basis for default it not raised – or even recognized – by the parties in this proceeding, the undersigned possesses authority to address it *sua sponte* pursuant to Rule 4 of the Rules Governing Section 2254 Cases.

Instead, as the Superior Court recognized, Petitioner never raised the ineffective assistance of counsel claim with respect to the photographs, as recited in Issue No. 5, at the PCRA trial court. It discussed this with respect to Issue No. 8.

> In his eighth claim, Engram argues that the PCRA court violated his right to due process by denying his PCRA Petition while he was still investigating several of his ineffectiveness claims. *See* Brief for Appellant at 62-64. Engram states that he received the Commonwealth's Answer to his PCRA Petition on May 20, 2019, and he needed further time to investigate his claims before filing a reply brief. *Id.* **According to Engram, he filed a Reply Brief on August 5, 2019, but advised the PCRA court that he intended to file a supplemental brief regarding the fifth claim that he raised herein.** *Id.* **Engram states that the PCRA court denied his PCRA Petition on January 10, 2020, before he had the opportunity to file the supplemental reply brief**. *Id.*
>
> Here, Engram does not explain how his right to due process was violated, when he was afforded nearly eight months to investigate the Commonwealth's responses in its Answer. Nor does Engram support his claim with citation to legal authority. Accordingly, this claim is waived. *See Johnson*, *supra*.

Engram, 2021 WL 2265631, at *8 bold, underlined emphasis added; remaining emphasis as in the original). This intended "supplemental brief regarding the fifth claim" – which Petitioner never actually filed with PCRA trial court, in spite of no impediment apparent from the record, and with PCRA counsel's conclusion that such a claim was warranted at least as early as August 5, 2019, ECF No. 14-2 at 256-57 – presumably would have included the ineffective assistance of counsel argument based on the allegedly deceptive photographs. But it was never raised before the PCRA trial court, and thus and was not addressed on the merits by the Superior Court. 42 Pa. C.S.A. § 9544(b). Further, because it was not fairly presented to the PCRA trial court, and no longer may be, it is procedurally defaulted. O'Sullivan, 526 U.S. at 845; Lambert, 387 F.3d at 234.

Only the ineffective assistance of counsel portion of Ground Five with respect to Sergeant Wagner's allegedly false identification, as asserted in Issue No. 4 on appeal, remains.[8]

### 3.    Petitioner has failed to show that <u>Martinez</u> establishes cause to set aside default of Ground Four.

Petitioner concedes that Ground Four is procedurally defaulted. ECF No. 18 at 1. Otherwise, Petitioner' briefing with respect to this ground is confusing. First, the claim, as presented in the Petition, reads as follows:

> IV. THE PROSECUTOR KNOWINGLY USED FALSE EVIDENCE WHEN IT FAILED TO CORRECT POLICE TESTIMONY THAT WAS OFFERED TO BOLSTER DEFICIENCIES IN THE POLICE INVESTIGATION, IN VIOLATION OF THE DUE PROCESS CLAUSE -- TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT[.]

<u>Id.</u> at 30. There are two factual bases that underly this claim, as recited in the Petition. The first is that the prosecution knowingly relied on false evidence with respect to testimony regarding the legality of using photo arrays. <u>Id.</u> at 30. However, in his supporting brief, Petitioner explicitly withdrew this first basis. ECF No. 12 at 35 n. 6.

The second factual basis is that the prosecution relied on allegedly false testimony regarding the requirements for obtaining a search warrant, which Petitioner has not withdrawn.

---

[8] While it does not appear that Petitioner raises <u>Martinez</u> as a basis to excuse default with respect to this claim, it is worth noting that he has failed so present a substantial claim of ineffective assistance of counsel with respect to these photographs. <u>See</u> Part II.B.3, <u>infra</u>. Even though the photos at issue obviously were taken during the daytime, the jury was informed that the murder took place at night. Trial Tr. dated Nov. 8-12, 2010 at 19, 161. It also was informed of the approximate distance of the victim's SUV from the store window through which Sergeant Wagner viewed the murder. <u>Id.</u> at 264-65. Further, the obstructions to Sergeant Wagner's ability to view the shooting – and the credibility of his identification in general – were extensively explored by trial counsel. Trial Tr. dated Nov. 8-12, 2010 at 56-59. To the extent that Petitioner argues that the placement and/or focal length of the camera resulted in photos that were inaccurate, that argument sounds in expert evidence, none of which appears on the record, and which may not be presented now. <u>Williams v. Sup't Mahanoy SCI</u>, 45 F.4th 713, 720 (3d Cir. 2022).

ECF No. 1 at 31. Petitioner also asserts that trial counsel was ineffective for failing to object to this evidence, and that PCRA counsel was ineffective for failing to raise the ineffective assistance of counsel claim in the PCRA proceeding. ECF No. 18 at 15.

Petitioner argues that his default of Ground Four should be set aside based on the Supreme Court's holding in Martinez, 566 U.S. at 1. ECF No. 18 at 15. But see ECF No. 12 at 40-41 (recognizing that Martinez does not apply to the Due Process portion of this claim, and relying on the miscarriage of justice exception). Petitioner does not appear to apply Martinez to any other defaulted claim in his briefing.

The United States Supreme Court has held that where a petitioner has to failed to follow state procedure within the required time period, the "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; see also Wainwright v. Sykes, 433 U.S. 72, 86-87 (1977) (failure to follow state's procedural rules results in procedural default, which bars federal review of petitioner's claims unless he can show cause and prejudice); Hull v. Freeman, 991 F.2d 86, 90-91 (3d Cir. 1993) (same). The Supreme Court in Coleman further recognized "the important interest in finality served by state procedural rules and the significant harm to the States that results from the failure of federal courts to respect them." 501 U.S. at 750.

The Supreme Court has defined "cause" as "some objective factor external to the defense." Murray v. Carrier, 477 U.S. 478, 488 (1986). "[A] showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or . . . some interference by officials" are two examples, but not an exhaustive list. Id.

In <u>Martinez</u>, the Supreme Court created a limited equitable rule wherein ineffective assistance of post-conviction counsel can establish cause to set aside the default of "a substantial claim of ineffective assistance at trial[.]"  556 U.S. at 17.  The <u>Martinez</u> exception applies only under specific circumstances where post-conviction counsel is ineffective for failing to raise such a claim on collateral review.  As this Court has previously explained:

> The decision of the United States Supreme Court in <u>Martinez v. Ryan</u> created a sea change in the doctrine of procedural default, holding for the first time that a claim of ineffective assistance of post-conviction relief counsel could serve as cause to excuse the procedural default of a claim of trial counsel's ineffectiveness. However, the Supreme Court in <u>Trevino v. Thaler</u>, 133 S.Ct. 1911, 1918 (2013) explained that <u>Martinez</u> only permits a federal habeas court to find "cause" based on post conviction counsel's ineffectiveness and "thereby excus[e] a defendant's procedural default, where (1) the claim of 'ineffective assistance of trial counsel' was a 'substantial' claim; (2) the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the 'initial' review proceeding in respect to the 'ineffective-assistance-of-trial-counsel claim'; and (4) state law requires that an 'ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

<u>Taylor v. Pennsylvania</u>, No. 15-1532, 2018 WL 446669, at *9 (W.D. Pa. Jan. 16, 2018).  A claim is "substantial" when it has "some merit," analogous to the standard for a certificate of appealability.  <u>Martinez</u>, 566 U.S. at 14.  <u>See also</u> <u>Cox v. Horn</u>, 757 F.3d 113, 119 (3d Cir. 2014).

As such, the <u>Martinez</u> exception cannot be used to provide "cause" for Petitioner's direct Due Process claim.  Nor does <u>Martinez</u> apply to claims of ineffective assistance of direct appeal counsel, and will not apply to direct appeal counsel's failure to raise the direct Due Process claim on direct appeal.  <u>Davila v. Davis</u>, 582 U.S. 521, 526-27 (2017).

Thus, all that remains of Ground Four that is relevant to <u>Martinez</u> is whether trial counsel was ineffective for failing to object to the prosecution's use of the following testimony and arguments, as set forth in Petitioner's Brief.

> Q: Why didn't you get a search warrant and search [Petitioner's] home.
>
> A: Not enough information received that he took the gun to his house and not enough probable cause to get a search warrant for his house.
>
> Q: You cannot just go and search whatever you want, someone's house?
>
> A: No.
>
> Q: Why not?
>
> A: It's illegal.
>
> Q: It's unconstitutional?
>
> A: Yes.
>
> TT 163.
>
> Jobe cross examined Canofari on this issue, and he responded as follows:
>
> Q: And you need articulable facts which would get you probable cause to get the warrant?
>
> A: Yes.
>
> Q: So you are telling the ladies and gentlemen you don't have the evidence. You have the evidence to get an arrest warrant, but not the evidence – you have a suspect wanted in a homicide. You are telling the ladies and gentleman a Judge would not get you a search warrant for the residence?
>
> A: Precisely. We had an arrest warrant for him because an eyewitness picked his picture out and said, this person shot that person at the gas station. Nobody that said he had a gun in his hand and went into his house and that's where he lives.

> Q: That's the only reason you can get a search warrant?
>
> A: There are several factors. If somebody told us he took that weapon or somebody saw him. We had enough for an arrest warrant for him because the person pointed him out and said they saw him do it. That doesn't give us enough information for the search warrant for the house.
>
> TT 171-172.
>
> The prosecution doubled down on the alleged inability to procure a search warrant in its closing, stating:
>
> We have a Constitution, thank goodness, that tells you that you cannot knock someone's door in without a search warrant and you cannot get a search warrant until you have probable cause, evidence of a crime inside. Because someone is suspect in a shooting, you cannot get a search warrant and go kick the door in and search their house, their grandmother's house, their grandfather's house. For all we know, the gun is on the bottom of the Mon River.
>
> You need a nexus to the house in order to get a search warrant to break down the door and search the house. Thank God that is our Constitution. Nobody wants our doors kicked down without probable cause. Just because the defendant was named that night as the shooter and picked out of a photo array, you need more than that. You need a witness to say, I saw him going into the house with a gun. Then you can get a search warrant.
>
> TT 323.

ECF No. 12 at 35-37 (quoting Trial Tr. dated Nov. 8-12, 2010).

It is Petitioner's burden under Martinez to establish that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." 566 U.S. at 14.

The parties dispute whether the above testimony is an incorrect statement of the law. ECF No. 14 at 70-71; ECF No. 18 at 14. In the end, however, that does not matter. This is because, even presuming that the facts underlying this case provided probable cause for a search

warrant for Petitioner's home, Petitioner does not explain, and this Court cannot contrive, how witness testimony and the prosecution's concession that there was not probable cause to tie the murder weapon to Petitioner's home – and indeed, that the prosecution had no idea where the murder weapon was even at the time of trial – prejudiced Petitioner at all.  To the contrary, Petitioner's counsel used this exchange to paint the police as individuals not to be trusted.  Trial Tr. dated Nov. 8-12, 2010, at 171-72, 316-17.

As such, Petitioner has failed to establish "some merit" to the underling ineffective assistance of counsel claim based this alleged omission.  Thus, Martinez does not provide a basis to excuse the procedural default of Ground Four.

### 4.    Petitioner has failed to meet the heavy burden to demonstrate actual innocence.

In order to show a fundamental miscarriage of justice, the United States Supreme Court requires a petitioner to demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."   Schlup v. Delo, 513 U.S. 298, 321 (quoting Murray, 477 U.S. at 496).  Under this standard, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup, 513 U.S at 324.  In the Third Circuit, "when a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the Schlup actual innocence gateway."   Reeves v. Fayette SCI, 897 F.3d 154, 164 (3d Cir. 2018), as amended (July 25, 2018).

"[A]s part of the reliability assessment of the first step, the court 'may consider how the timing of [the petitioner's] submission and the likely credibility of the [witnesses] bear on the

probable reliability of that evidence,' as well as the circumstances surrounding the evidence and any supporting corroboration.  Id. at 161 (citing House v. Bell, 547 U.S. 518, 537, 551 (2006)). New, reliable evidence that "undermine[s] the [trial] evidence pointing to the identity of the [perpetrator] and the motive for the [crime]" can suffice to show actual innocence.  Goldblum v. Klem, 510 F.3d 204, 233 (3d Cir. 2007).

Once such evidence is presented, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup, 513 U.S at 327.  But "[i]t is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency."  See Bousley v. United States, 523 U.S. 614, 623 (1998).  A gateway actual innocence standard is "demanding" and satisfied only in the "rare" and "extraordinary" case where "a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error."  Reeves, 897 F.3d at 161 (quoting McQuiggin v. Perkins, 569 U.S. 383, 386, 392, 401 (2013)).

In evaluating whether it is more likely than not that no reasonable juror would convict the petitioner, a court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  House, 547 U.S. at 538.  In weighing the evidence, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors"; the actual innocence standard "does not require absolute certainty about the petitioner's guilt or innocence."  House, 547 U.S. at 538.

Here, Petitioner explicitly relies on the alibi testimony at Petitioner's PCRA hearing as the "new" evidence that supports his claim of actual innocence. ECF No. 1 at 19, 21. See also ECF No. 12 at 24-27; ECF No. 18 at 6.

On April 22, 2010, Petitioner filed a Notice of Alibi Defense, naming his mother, Jessie Trice, and his former landlord, Stephen Nemeth, as witnesses. ECF No. 14-1 at 44. This presumably was in response to a motion by the prosecution for discovery that was filed on March 12, 2010, but which was not granted until April 26, 2010. Id. at 33, 43. Petitioner's counsel did not call any alibi witnesses at trial, and his failure to do so provides the basis for Ground One of the instant federal habeas Petition.[9]

At Petitioner's PCRA hearing, he presented testimony from several purported alibi witnesses. These included Stephen Nemeth, the above-mentioned former landlord, who testified that he rented a house to Petitioner's family in June of 2007, and that they moved out about a year later. PCRA Hr'g Tr. dated. May 21 and 23, 2019, at 40-4; ECF No. 7-2 at 40-41. He did not testify as to an exact date that they moved at the hearing.

In an affidavit submitted along with Petitioner's "Response to Notices of Intent to Dismiss PCRA Petition and New Claims of PCRA Ineffectiveness Pursuant to Commonwealth v. Pitts," Nesmith averred that he evicted Petitioner's family in 2008, but that he helped them move. He did not recall the exact dates, but remembered that the move took several days, as well as that Petitioner "helped a lot with the move." Id. at 746. In the Petition, Petitioner asserts that Nemeth had a "close relationship" with the Engram family. ECF No. 1 at 19.

---

[9] It is relevant to note that, at trial, Petitioner himself acknowledged to the trial court that he was not going to call alibi witnesses. Trial Tr. dated Nov. 8-12, 2010, at 302.

The next alibi witness to testify at the PCRA hearing was Petitioner's mother, Jessie Trice Johnston. ECF No. 7-2 at 61. She testified that after the eviction, her family began moving to their new home on September 21, 2008 – the day before the murder. Id. at 65-66. She stated that the move took several days, and involved heavy items like a washer, dryer, and refrigerator. Id. at 66. They used the family truck to move, but had to move at night because her husband worked during the day, and would not return home until 5:30 or 6:00 pm. Id. at 67-68. Moving would continue until 12:30 or 1:00 am each night. Id. at 70, 80. Petitioner, his brother, and her nephew David, were required to load and unload the family's belongings "[b]ecause it was a lot of heavy stuff." Id. at 68-69.

Mrs. Johnston remembered moving on September 22, 2008 – the night of the murder. Id. at 70-71. She remembered that date specifically because there was a Steeler's game on one of the days that she was packing. Id. at 71. The move began around 6:00 or 7:00 that night. Id. at 80. Her husband drove the truck back and forth between houses. Id. Petitioner was present on these trips, and never exited the truck or disappeared while moving. Id. at 75-76. Mrs. Johnston would have noticed if he had because, without Petitioner, his brother, and her nephew, they would not have been able to unload their truck. Id. at 76. Petitioner was in the back of the truck on these trips, and he never left her sight. Id. at 81. However, she also testified that, on trips where her husband was driving, they were with him as far as she knew. Id. at 85.[10]

Mrs. Johnston's affidavit was generally consistent with her testimony, but less detailed. ECF 14-1 at 741-42.

---

[10] Petitioner's mother also testified that the night of September 22, 2008 was warm. Id. at 81-82.

The third alibi witness to testify as Gregory Johnston, Petitioner's stepfather. ECF No. 7-2 at 86. His testimony was generally consistent with that of Mrs. Johnston.[11] He testified as to the eviction, id. at 91; that he worked weekends, id.; that Petitioner helped with loading and unloading heavy items during the move, id. at 94-95; that Petitioner lacked a driver's license, id. at 96, that the move took place between 4:00 pm and 1:00 am on the nights of September 21, 22, and 23, 2008, with additional moving on September 24. Id. at 98. He testified that Petitioner was working with him on the move at the time of the murder. Id. at 102.

Mr. Johnston did not remember who was driving the truck on September 22, 2008. Id. at 105. He did not remember what time he left the house, or where everyone was sitting in the truck, or of the specific timing of the trips between houses. Id. at 105-06. He did not believe that Petitioner "disappeared" during any of the trips. Id. at 107.

There is significant overlap between Mr. Johnston's testimony at the PCRA hearing and in his affidavit. ECF No. 14-1 at 743-44. One significant deviation is that, in the affidavit, Mr. Johnston did not make an averment as to the specific dates on which the move occurred.

The final alibi witness to testify was Petitioner's brother, Jerry Engram. ECF No. 7-2 at 112. He testified that he helped with the move by packing and lifting. Id. at 115. While he did not help move on the Saturday that weekend, he remembered that helped move on Sunday because of the Steelers football game.[12] Id. at 117. He did not remember the specific dates of when the move occurred. Id. at 124.

---

[11] Petitioner's stepfather confirmed that Petitioner's nickname was "La La" or "LL." Id. at 88, 103-04. Compare with Tr. of Statement of Shermaine Campbell, ECF No. 14-2 at 707 (identifying "L-L" as the murderer).

[12] In an apparent attempt to impeach Jerry Engram's credibility, the prosecution asked him on cross-examination whether the Steelers game which he testified had occurred was a divisional (continued . . . .)

Jerry Engram testified that packing started after Mr. Johnston returned home from work at about 5:00 or 5:30 pm. Id. at 118-19. He, Petitioner, and his cousin, David, were the "heavy lifters." Id. at 119. They would work at moving until 12:00 or 1:00 in the morning. Id. at 120. The move felt rushed. Id. Neither he, nor Petitioner, nor their cousin ever "left the car and disappeared" during the move. If someone had, they would have been too short-handed to move the heavy items between the houses. Id.

Jerry Engram testified that he went on "approximately every trip" between the houses, likewise for Petitioner and their cousin. Id. at 121. Petitioner did not drive because he lacked a driver's license. Id. A few days later, Jerry Engram was arrested because police mistook him for Petitioner. Id. at 122-23.[13]

Finally, an affidavit of David Tyrone Trice – Petitioner's cousin – was submitted as alibi evidence. ECF No. 14-1 at 745. In the affidavit, Mr. Trice averred that he remembered that he helped move on a Sunday, Monday, and Tuesday – although he could not name the exact date. He remembered that he started packing on a Sunday because a Steelers game was on. He remembered working late – until at least midnight – each night. Petitioner was helping there as well. Id. For reasons that are unclear, Mr. Trice did not testify at the PCRA hearing.

---

playoff. Id. at 124-25. Jerry Engram agreed that it was. Id. at 125. But this is not the case. The public record indicates that the Pittsburgh Steelers played the Philadelphia Eagles on **Sunday, September 21, 2008**, and it was not a playoff game. https://www.steelers.com/schedule/2008/ (last visited Mar. 11, 2025)). The Steelers did not play again until September 29, 2008. Id. Additionally, it is noteworthy that the murder took place approximately at 10:40 pm on **Monday, September 22, 2008**, the night **after** the Steelers game versus the Eagles. Engram, 2021 WL 225631, at *1; ECF No. 14-1 at 1, 414 and 926.

[13] The record indicates that the Jerry Engram's affidavit was executed on May 21, 2019 – the first day of the PCRA hearing – and submitted as Petitioner's Exhibit 27. ECF No. 14-2 at 255. See also ECF No. 7-2 at 114. The undersigned was unable to locate a copy of the affidavit either in the electronic or paper state court record.

Because the foregoing evidence was not presented at trial, allegedly through trial counsel's ineffectiveness, it is "new" for the purposes of the miscarriage of justice analysis. Reeves, 897 F.3d at 164.

This Court has thoroughly reviewed the additional alibi evidence, along with the state court record, the video underlying Ground Two, the photographs underlying Ground Five, and the deposition transcripts obtained through the limited discovery authorized by this Court on December 6, 2023, ECF No. 53, and entered into the expanded record on April 29, 2024. ECF Nos. 64 and 66. The undersigned concludes that the evidence does not meet the heavy burden set forth in Schlup to establish that no reasonable juror would have convicted Petitioner in light of it. 513 U.S at 327.

First, the evidence of Stephen Nemeth does not indicate that Petitioner was factually innocent of the murder. While the undersigned acknowledges Petitioner's argument that Mr. Nemeth's testimony was improperly limited by the PCRA trial court, ECF No. 12 at 21, the fact remains that his contribution to the record before this Court does not provide an alibi for the night of the murder.

Second, all of the remaining alibi testimony came from Petitioner's family, and suffers from the same credibility issues that Petitioner's trial counsel recognized with respect to Petitioner's mother. As set forth by the Superior Court:

> Here, Attorney Jobe testified at the PCRA hearing as follows:
>
> The only alibi witness, I believe, we were discussing on presenting was Jessie [E]ngram, who is [ ] Engram's mom. We had several discussions. She was always very involved in the case. We had several discussions regarding the case and regarding the alibi. The alibi I believe, being proper for – they were moving. Okay? That's not really a time watching event, although moving is very – can be very exhausting. But given the issue and the timing of when this shooting allegedly took place, you have to concern yourself

41

whether it's going to hold up under cross examination and how it's going to be perceived by the jury.

In this case, I did not believe that there was enough there for this alibi to be air tight to where it could say: This is where he was at the time of the shooting. It seemed like[ ], to me, based on the information that I received, this moving was – I was comfortable with that information that moving did occur that day, but around the time of the shooting, I was not comfortable saying it was – I think this was around 10:45 [p.m.] I don't know when the shooting was actually. But I know I had concerns about that.

And then you take into fact that this was his mother, obviously. So there was going to be some inherent credibility issues, because it's her son. So she's going to say what she needed to say. The issue would be on cross examination, if there is any blundering or if there is any inconsistencies or the alibi is blown away. Then the Commonwealth could pretty much argue that looks like a coverup. That maybe she does know that her son did something when she's saying that he can.

So the evidence is cut both ways. It's a judgment call. And because I had a witness that I knew going into the trial that was [the Commonwealth's] star witness, who was going to recant, which we did have a complete recant by that witness, when you factor in all those things, do you want to open up that box or not. Sometimes presenting evidence can do more harm that it can do good.

N.T., 5/21-23/19, at 152-53 (some paragraph breaks omitted and added).

Engram, 2021 WL 225631, at *4. See also ECF No. 7-2 at 152-53.

Moreover, reference by Mrs. Johnston and Jerry Engram to a Pittsburgh Steeler's football game as a basis for remembering when the move took place undercuts the strength of the alibi evidence. Public record supports the conclusion that the Steelers played on the **night prior** to the murder, and not the night of the murder itself. A reasonable juror could conclude that their testimony that Petitioner was with them actually related to the wrong night. This simply is not sufficient to meet the Schlup standard. Thus, the miscarriage of justice exception does not save Petitioner's defaulted claims.

### 5.    Summary of defaulted claims

For the reasons set discussed above, this Court finds that the following Grounds for relief

– or portions thereof – to be procedurally defaulted.

- The portion of Ground One asserting that trial counsel was ineffective for failing to withdraw Petitioner's alibi defense prior to trial. The remainder of Ground One is not procedurally defaulted.

- The entirety of Ground Four, as conceded by Petitioner. ECF No. 1 at 18.

- The portion of Ground Five directly asserting a Due Process Claims based on Officer Wagner's alleged false testimony and allegedly manipulated photos, as well as his ineffective assistance of counsel claim with respect to the same photos. The remainder of Ground Five is not procedurally defaulted.

- The entirety of Ground Six, as conceded by Petitioner.[14]  Id.

## IV.    ANALYSIS OF THE MERITS OF PETITIONER'S SURVIVING CLAIMS

The following is a summary of Petitioner's remaining, exhausted grounds for federal

habeas relief.

- The portion of Ground One asserting that trial counsel was ineffective for failing to investigate Petitioner's alibi defense. ECF No. 1 at 19.

- Ground Two, asserting that trial counsel was ineffective for failing to introduce allegedly exculpatory surveillance video at trial. Id. at 23.

- Ground Three, asserting that trial counsel was ineffective for failing to object to the introduction of speculative, unfairly prejudicial hearsay evidence. Id. at 27.

---

[14] The undersigned acknowledges the dissonance between finding that Ground Six is procedurally defaulted, and the Court's earlier Order finding that good cause existed for discovery that was related to that claim. ECF No. 31. But see Wholaver v. Wetzel, No. 1:11-CV-0164, 2022 WL 17082094, at *2-4 (M.D. Pa. Nov. 18, 2022) (discussing habeas discovery in the context of a claim of a Brady violation). Cf. Fooks v. Sup't., Smithfield SCI, 96 F.4th 595 (3d Cir. 2024) (remanding a habeas case for a hearing – despite no explicit finding that either Section 2254(d)(1) or (d)(2) had been satisfied, where a petitioner had adequately *alleged* a constitutional violation, and the state court had denied a hearing). Under the particular facts of this case, as set forth in the Order granting discovery, ECF No. 31, good cause existed for the limited discovery that was allowed, even if Ground Six ultimately turned out to be procedurally defaulted. In any event, discovery did not yield any suppressed exculpatory video.

- The portion of Ground Five asserting that trial counsel ineffectively failed to challenge Sergeant Wagner's allegedly fabricated identification of Petitioner. <u>Id.</u> at 34; ECF No. 12 at 40.

**A.    Standard of Review**

Where the state court has reviewed a federal issue presented to them and disposed of the issue on the merits, and that issue is also raised in a federal habeas petition, the AEDPA provides the applicable deferential standards by which the federal habeas court is to review the state court's disposition of that issue. <u>See</u> 28 U.S.C. § 2254(d) and (e).

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the United States Supreme Court expounded upon the standard found in 28 U.S.C. § 2254(d). The Supreme Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: 1) where the state court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or 2) where that state court decision "involved an unreasonable application of [] clearly established Federal law as determined by the Supreme Court of the United States." <u>Id.</u> at 404-05 (emphasis deleted).

A state court decision can be contrary to clearly established federal law in one of two ways. First, the state courts can apply a wrong rule of law that is different from the rule of law required by the United States Supreme Court. Second, the state courts can apply the correct rule of law but reach an outcome that is different from a case decided by the United States Supreme Court where the facts are indistinguishable between the state court case and the United States Supreme Court case. <u>Lambert</u>, 387 F.3d at 234 (quoting <u>Williams</u>, 529 U.S. at 405-06).

In addition, the United States Court of Appeals for the Third Circuit has explained that "Circuit precedent cannot create or refine clearly established Supreme Court law, and lower federal courts 'may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme] Court,

be accepted as correct.'" Dennis v. Sec., Pa. Dep't of Corrs., 834 F.3d 263, 368 (3d Cir. 2016) (quoting Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam)). As the Supreme Court has further explained: "[s]ection 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." White v. Woodall, 572 U.S. 415, 428 (2014).

The AEDPA also permits federal habeas relief where the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Specific factual determinations by the state court that are subsidiary to the ultimate decision to grant post-conviction relief are subject to the presumption of correctness, and must be overcome by Petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). See also Lambert, 387 F.3d at 235-236. The Third Circuit has declined to adopt a "rigid approach to habeas review of state fact-finding." Id. at 236 n.19. If a state trial court and appellate court make conflicting factual findings, the habeas court must defer to the findings of the higher court – regardless of the propriety of those findings under state law – unless they are rebutted by clear and convincing evidence. See Rolan v. Vaughn, 445 F.3d 671, 680 (3d Cir. 2006).

It is a habeas petitioner's burden to show that the state court's decision was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts. Ross v. Atty. Gen. of State of Pennsylvania, No. 07-97, 2008 WL 203361, at *5 (W.D. Pa. Jan. 23, 2008). This burden means that Petitioner must point to specific caselaw decided by the United States Supreme Court and show how the state court decision was contrary to or an unreasonable application of such United States Supreme Court decisions.

Owsley v. Bowersox, 234 F.3d 1055, 1057 (8th Cir. 2000) ("To obtain habeas relief, Mr. Owsley must therefore be able to point to a Supreme Court precedent that he thinks the Missouri state courts acted contrary to or unreasonably applied. We find that he has not met this burden in this appeal. Mr. Owsley's claims must be rejected because he cannot provide us with any Supreme Court opinion justifying his position."); West v. Foster, No. 07-CV-00021, 2010 WL 3636164, at *10 n.20 (D. Nev. Sept. 9, 2010) ("petitioner's burden under the AEDPA is to demonstrate that the decision of the Supreme Court of Nevada rejecting her claim 'was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*.' 28 U.S.C. § 2254(d)(1) (emphasis added). Petitioner has not even begun to shoulder this burden with citation to apposite United States Supreme Court authority."), aff'd, 454 F. App'x 630 (9th Cir. 2011).

To the extent that a claim was fairly presented to the state courts but was not addressed on the merits, *de novo* review applies. Cone v. Bell, 556 U.S. 449, 472 (2009). The same review applies to a claim that resulted from a state court decision that was contrary to or an unreasonable application of United States Supreme Court precedent and/or an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1) and (2).

Here, the AEDPA standard of review applies to all of Petitioner's remaining grounds for relief.

### B.    The Right to Effective Assistance of Counsel

All of Petitioner's remaining claims sound in ineffective assistance of counsel. Accordingly, the "clearly established Federal law" at issue in this habeas proceeding is the effective assistance of counsel standard set forth in Strickland v. Washington, 466 U.S. 668 (1984).

46

The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland, 466 U.S. at 684). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: (1) counsel's performance was unreasonable; and (2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. Id. at 690.

The first prong of the Strickland test requires a petitioner to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689. The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. Id. Petitioner is required to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104 (2001) (quoting Strickland, 466 U.S. at 687).

The second prong of the Strickland test requires a petitioner to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a petitioner must show that there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> at

694. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome.

<u>Id.</u>

 In considering claims of ineffectiveness of counsel, Pennsylvania uses a three-part

effectiveness test.

> To plead and prove ineffective assistance of counsel a petitioner
> must establish: "(1) that the underlying issue has arguable merit;
> (2) counsel's actions lacked an objective reasonable basis; and (3)
> actual prejudice resulted from counsel's act or failure to act."
> <u>Commonwealth v. Stewart</u>, 84 A.3d 701, 706 (Pa. Super. 2013) (*en
> banc*). The failure to meet any of these aspects of the
> ineffectiveness test results in the claim failing. <u>Id.</u>

<u>Future v. Ferguson</u>, No. 16-2346, 2022 WL 2307095, at *8 (M.D. Pa. June 27, 2022), <u>certificate</u>

<u>of appealability denied sub nom</u>. <u>Future v. Sup't Benner Twp. SCI</u>, No. 22-2419, 2022 WL

18536146, at *1 (3d Cir. Dec. 6, 2022). The United States Court of Appeals for the Third Circuit

has found this test not to be contrary to <u>Strickland</u>. <u>Werts v. Vaughn</u>, 228 F.3d 178, 204 (3d Cir.

2000).

 Here, the Superior Court applied Pennsylvania's three-part test to Petitioner's claim of

ineffective assistance of counsel in his PCRA appeal. <u>Engram</u> 2021 WL 225631, at *3.

Accordingly, the Superior Court's analysis was not contrary to <u>Strickland</u>.

### 1. The remaining portion of Ground One

#### a. Consideration of the merits

 In the exhausted portion of Ground One, Petitioner argues that trial counsel was

ineffective for failing to investigate his alibi defense. ECF No. 1 at 19.

 The content of Petitioner's alibi evidence, as presented to the PCRA trial court, was

discussed in Part III.B.4, <u>supra</u>, and is incorporated by reference herein. The only additional

content of that testimony that is relevant to this Ground is that the alibi witnesses testified at the hearing either that they were not contacted by trial counsel regarding presenting alibi evidence, ECF No. 14-1 at 746 (Stephen Nemeth), ECF No. 7-2 at 102-03 (Gregory Johnston); id. at 124 (Jerry Engram); or that they did discuss it, but without detail, ECF No. 14-1 at 741, ECF No. 7-2 at 77 (Jessie Trice Johnson).  It also should be noted that Petitioner himself confirmed on the record at trial that he understood that he would not call alibi witnesses.  Trial Tr. dated Nov. 8-12, 2010, at 302.

As recited in Part III.B.4, supra, Petitioner's trial counsel testified at the PCRA hearing that he recalled only Petitioner's mother as a potential alibi witness.  Trial counsel believed that the case was strong enough to avoid doing so because the prosecution's "star witness," Shermaine Campbell, was going to recant on the stand.  In light of credibility issues that he perceived with Petitioner's mother's testimony – including that Petitioner was her son – and the risk that the prosecution would capitalize on these issues to portray the alibi as a coverup, trial counsel chose not to call her.  ECF No. 9-2 at 152-54.

From the PCRA hearing testimony, the Superior Court concluded as follows.

> Thus, Attorney Jobe investigated the purported alibi, and made a reasonable strategic decision not to call Engram's mother as a witness. *See Basemore, supra*. Engram has not alleged that, prior to trial, he informed Attorney Jobe about any other potential alibi witnesses whom Attorney Jobe failed to investigate. *See id.* We conclude that Attorney Jobe adequately investigated Engram's purported alibi. *See id.* Accordingly, Engram's underlying claim lacks merit, and Attorney Jobe was not ineffective on these grounds. *See Treiber, supra.*

Engram, 2021 WL 225631, at * 4.

This Court interprets the Superior Court's finding that this claim "lacks merit" to rest on the first prong of the Strickland test.

Upon review, the undersigned cannot say that the Superior Court's determination was founded on either an unreasonable application of Strickland, or an unreasonable determination of the facts. Based on the alibi theory presented in Petitioner's post-conviction and habeas proceedings, no one would be more aware of potential alibi witnesses than Petitioner himself. The same is true of the facts underlying Petitioner's asserted alibi. It is hard to contrive what additional facts or additional witnesses that trial counsel could have determined through independent investigation of Petitioner's alleged alibi that Petitioner could not have told him himself.

Further, the credibility issues with the alibi testimony that trial counsel imputed on Petitioner's mother, and which are discussed more at Part III.B.4, supra, appear to apply to all of Petitioner's potential alibi witnesses. To the extent that Petitioner's trial counsel had conducted additional investigation, it appears from the PCRA record that the same reasoning would apply to a decision not to call the rest of Petitioner's family to the stand. Accordingly, relief under this ground must be denied.

### b.    Consideration of a certificate of appealability

The undersigned recognizes that, at the time of trial, the evidence tying Petitioner to the murder was not overwhelming. Two eyewitness who identified him as the shooter recanted their identifications on the stand at trial. The only unrecanted testimony tying Petitioner to the murder was that of Sergeant Wagner, who testified that he witnessed Petitioner commit the shooting. But Sergeant Wagner's identification of Petitioner did not appear on the record until 20 months after the murder, and suffered from credibility issues that are discussed in more detail in Part IV.B.4, infra.

Further, despite the issues of credibility with the alibi witness testimony, as discussed above, it includes evidence that was not presented at trial. Namely, more than simply restating that no one could credibly identify Petitioner at the scene of the murder, the alibi testimony was evidence – whether credible or not – that Petitioner affirmatively was somewhere else at the time of the shooting.

A certificate of appealability is appropriate when "reasonable jurists would find the district court's assessment of the constitutional claims [which were denied on the merits to be] debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000); 28 U.S.C. § 2253(c). Based on the record before this Court, the undersigned cannot say, with certainty, that reasonable jurists could not debate that trial counsel's failure to investigate and present the aforementioned alibi evidence was the result of sound trial strategy – even under the extremely deferential standard of review that this Court is constrained to apply. Thus, a certificate of appealability will be granted as to the remaining portion of this ground for relief.

### 2.    Ground Two

At Ground Two, Petitioner asserts that trial counsel was ineffective for failing to introduce allegedly exculpatory surveillance video of the front driveway and gas pumps of the scene of the murder. ECF No. 1 at 23. Petitioner asserts that the video would have accomplished the following at trial.

> 1. [I]t would have demonstrated that Officer Wagner's identification of Petitioner was not possible because, due to his location within the store at the time of the shooting, he could not have seen what he says he saw[.][15]

---

[15] In a footnote in his supporting brief, Petitioner states that he "does not press this first point, as the Superior Court correctly found that the video showed only a view from the roof." ECF No. 12 at 30 n.4. This footnote is confusing, and it is unclear whether it indicates that Petitioner has abandoned this argument, which he had raised on the same page in the body of his supporting brief. Id. at 30.

2. [T]he video would have shown that the alleged excited utterance of Shermaine Campbell did not occur because the police said it happened outside the store, [that] this is not shown on the recovered video[.]

3. [I]t would have refuted Wagner's testimony that the shooter was dressed in a suspicious manner, thus drawing his attention to the shooter.

ECF No. 12 at 30.

The transcript of trial counsel's testimony at the PCRA hearing regarding his decision not to introduce this video is confusing. However, as best the undersigned can tell, it appears that trial counsel chose not to do so because he did not think that it was probative or exculpatory. ECF No. 7-2 at 151.

The Superior Court addressed this claim as follows. As to Petitioner's first point:

> Our review of the record discloses that the Sunoco camera was positioned on the roof of the convenience store, and not inside the store, where Officer Wagner was positioned when he witnessed the shooting. *See* N.T., 11/8-12/10, at 32. Engram does not explain how the video would prove that there were obstructions to Officer Wagner's line of sight, when the camera was not positioned in the immediate vicinity of where Officer Wagner was standing. Additionally, Attorney Jobe extensively cross-examined Officer Wagner, and impeached the credibility of his testimony regarding his view of the shooting on other grounds. *See* N.T., 11/8-12/10, at 51-61, 67-68; *see also Commonwealth v. Dennis*, 715 A.2d 404, 408 (Pa. 1998) (stating that trial counsel was not ineffective in failing to impeach a witness on specific grounds, where trial counsel adequately cross-examined the witness and impeached the witness in other ways). Accordingly, we conclude that Engram's underlying claim lacks merit, and Attorney Jobe was not ineffective on these grounds. *See Treiber*, *supra*.

Engram, 2021 WL 225631, at * 5 (emphasis in the original).

As to Petitioner's second point, the Superior Court found:

> Engram claims that the officers who heard Campbell identify Engram as the shooter testified that Campbell made this statement to police while they were standing outside of the front of the Sunoco convenience store, minutes after the shooting. *Id.* at 30. Engram points out that the video spans from 10:37:15 p.m. to 10:52:37 p.m.; it shows the area outside of the front of the

convenience store; and the shooting occurred around 10:41:09, which is eleven minutes before the end of the video. *Id.* at 28. According to Engram, "[i]f this interview actually took place, it would have appeared on the video, but it does not." *Id.* at 30. Campbell argues that because the video was not shown to the jury, "[t]he jury could not accurately determine whether Campbell made this statement without seeing the video." *Id.*

Here, two Pittsburgh police officers testified at trial that they had heard Campbell identify Engram as the shooter. *See* N.T., 11/8-12/10, at 76-98. Officer Ed Trapp ("Officer Trapp") testified that he arrived at the Sunoco "roughly" five minutes *after the emergency call had been made to the police station*, and that he interviewed Campbell "probably three to five minutes after that." *Id.* at 78-79 (emphasis added). Thus, based on Officer Trapp's estimations, he spoke with Campbell between eight and ten minutes *after the call was made to the police station. Id.* It is unclear how long after the shooting occurred that the call was made to the police station. Therefore, even assuming that Officer Trapp's time estimations were correct, the evidence does not establish that he spoke with Campbell before the conclusion of the video.

Similarly, Sergeant Charles Henderson ("Sergeant Henderson") testified that he arrived at the Sunoco "about a minute" *after he had received the call*, and he heard Campbell identify Engram as the shooter approximately seven to ten minutes after he had arrived. *Id.* at 87. Thus, based on Sergeant Henderson's estimations, he heard Campbell make the identification around eight to eleven minutes after he had received the call. It is unclear how much time elapsed after the shooting, but before he received the call. Therefore, even assuming that Sergeant Henderson's time estimations were correct, the evidence does not establish that Sergeant Henderson heard Campbell identify Engram as the shooter before the conclusion of the video.

Moreover, Attorney Jobe cross-examined Campbell at trial, and elicited testimony from her that she did *not* identify Engram as the shooter to police at the Sunoco on the night of the shooting. *See id.* at 108. Thus, Attorney Jobe effectively rebutted the officers' testimony without needing to introduce the video into evidence. *See Dennis*, *supra*. Accordingly, Engram failed to establish ineffective assistance on this basis. *See Treiber*, *supra*.

Id. at *6 (emphasis in the original, internal footnote removed).

As to Petitioner's third point, the Superior Court stated:

> Third, Engram states that the video "contradicts [Officer] Wagner's testimony that the shooter was dressed in a suspicious manner" by wearing a hooded sweatshirt during "unusually hot weather" for that time of the year, where the video shows other gas station customers wearing "cool-weather attire," *Id.* at 27, 30-31. Engram argues that the video would have impeached the credibility of Officer Wagner's testimony by rebutting this statement regarding the weather. *Id.*
>
> Here, Attorney Jobe extensively cross-examined Officer Wagner, and impeached the credibility of his testimony on other grounds. *See* N.T., 11/8-12/10, at 51-61, 67-68; *see also Dennis*, *supra*. Accordingly, we conclude that Engram's underlying claim lacks merit, and Attorney Jobe was not ineffective on these grounds. *See Treiber*, *supra*.

Id. (emphasis in the original).

The undersigned interprets the Superior Court's analysis to rest on the first prong of Strickland.

This Court has reviewed the video in question. It is grainy, poorly resolved, and includes multiple gaps in time, and lacks audio. This video appears to have been taken from a camera positioned on the roof of the front of the store, and shows a brightly-lit driveway with four double-sided gas pumps arranged in two parallel rows of two. While people can be seen entering and exiting the store, the video does not actually show the door of the store when it is closed, or the window from which Sergeant Wagner allegedly saw Petitioner and the shooting. The video does not show much in the way of facial detail, and at times is almost impossible to follow.

From what this Court could follow, it appears that some individuals on the video may indeed have been wearing long sleeves, a hooded sweatshirt, or a jacket. See Video at 22:40:29; 20:41:09; 22:41:28. Other individuals appear to have been wearing short sleeves. Id. at 22:42:44; 22:48:46. One person, who entered the store shortly before the murder, and left

shortly afterward, clearly is wearing shorts and a t-shirt. Id. at 22:39:33 and 22:43:46. A black car that drove through the pumps less than a minute before the shooting may have been the Pontiac G6 that Sergeant Wagner mentioned in the initial report – lending support to the credibility of his initial statement. Id. at 22:40:08-28; See also ECF No. 14-2 at 765 ("Supplemental Report" dated Sept. 23, 2008, memorializing interview with Sergeant Wagner regarding the murder).

Upon review of the video, the undersigned cannot conclude that the Superior Court's determination was an unreasonable application of Strickland, or an unreasonable determination of the facts. Especially with respect to Petitioner's third argument regarding Wagner's testimony that the night was unseasonably warm, the individual wearing shorts and a t-shirt, as well as the multiple people apparently wearing short-sleeves, would seem to provide support for this statement. The bright lighting of the driveway – also apparent on the video – would support the conclusion that Wagner's view of the shooting was not obscured by poor lighting. Further, given the camera angles, lack of audio, and timing involved, it is impossible to determine from the video that Shermaine Campbell did not make an excited utterance naming Petitioner as the murderer.

For these reasons, this ground for relief will be denied.

### 3.   Ground Three

At Ground Three, Petitioner asserts that trial counsel was ineffective for failing to object to portions of Shermaine Campbell's prior recorded statement, which he argues were speculative, hearsay, and unfairly prejudicial. ECF No. 1 at 27.

This claim concerns an out-of-court taped statement given by Campbell to police on the night of the murder, in which she identifies Petitioner as the murderer. Trial Tr. dated Nov. 8-12,

2010, at 99, 101-02, and 108-09.  It was played for the jury at trial because Campbell recanted her identification of Petitioner.  Id. at 99, 112, 128, 132, and 134.  The tape was played over multiple objections by trial counsel, including hearsay, and that the evidence was cumulative and prejudicial.  Id. at 131-32.

A transcript of the recorded statement begins at ECF No. 14-2 at 705.  It indicates that it commenced at "0255 hours on September 23rd" – roughly four hours after the murder.  Id. at 706.  A copy of a photo of Petitioner, identifying him as "LL" and the man who shot the victim, was signed by Shermaine Campbell at 2:30 a.m. September 23, 2008.  Id. at 721.

Petitioner asserts that trial counsel was ineffective for failing to object to the following portion of Ms. Campbell's recorded statement:

> [DETECTIVE] WILLIAMS: Now, how do you know this L.L.?
>
> [SHERMAINE] CAMPBELL: I just see him around Garfield. I seen him in the Strip District. He know a few of my friends. But I don't know him personally to speak to him or nothing. I just know him to see him.
>
> WILLIAMS: And had Korey had, um, problems with him before?
>
> CAMPBELL: I know they weren't getting along but I don't know what the reason was.
>
> WILLIAMS: And how long had they not been getting along?
>
> CAMPBELL: I think ever since ... the guy that went to jail? About the little incident in Wilkinsburg?
>
> WILLIAMS: Are you talking about the little boy that was shot that you told us about before?
>
> CAMPBELL: Yes.
>
> WILLIAMS: And how does he relate with L.L?
>
> CAMPBELL: Because LL, he being Homewood, so, I'm guessing that he is friends or something with the guy that went to jail.

WILLIAMS: OK. And did anybody say anything to you specifically about them being friends and ... ?

CAMPBELL. No.

[DETECTIVE] MOFFATT: How does Korey fit into the whole picture with the boy getting killed in Wilkinsburg?

CAMPBELL: Well the guy that went to jail was shooting at Korey.

WILLIAMS: So when this happened when the little boy was killed?

CAMPBELL: Yes, ma'am. So that's all I know. Because I never even heard about it. I don't watch the news that much, so that.... just them two not getting along. That was all I knew. I didn't know why or I didn't ask why, I just knew they didn't get along.

MOFFATT: OK, so you knew that there were issues between them, and you weren't really friendly with L.L...

CAMPBELL: Right.

MOFFATT: ... or even enemies with L.L, but you knew him to see him around.

CAMPBELL: Yes, sir.

ECF No. 1 at 27-29. <u>See also</u> ECF No. 14-2 at 708-09.

The Superior Court addressed this claim as follows.

Engram states that Attorney Jobe was ineffective in failing to object to certain trial testimony by Campbell. ***See*** Brief for Appellant at 32-36. At trial, Campbell was examined regarding how she knew Engram, and how Engram and the victim knew each other. ***Id.*** at 32-33. Engram points out that, during that line of questioning, Campbell "guessed" that Engram was friends with a man who previously was involved in an attempt to murder the victim. ***Id.*** Engram argues that such testimony is barred by Pa.R.E. 602 as speculative, and caused prejudice by suggesting to the jury that Engram had shot the victim on this occasion. ***Id.*** at 32.

Here, even assuming Campbell's statement was speculative, it is unclear how the statement would establish, or even imply, that Engram shot the victim on this occasion. Accordingly, we

> conclude that Engram's underlying claim lacks merit and caused no prejudice. Consequently, Attorney Jobe was not ineffective for failing to object to the statement. ***See Treiber, supra.***

Engram, 2021 WL 225631, at *6-7 (emphasis in original).

The undersigned interprets the Superior Court's decision to rest on the second prong of the Strickland test, relative to prejudice.

Upon review of the record and the parties' arguments, Petitioner has failed to establish that the Superior Court's determination was based on an unreasonable application of Strickland or an unreasonable determination of the facts. It is not unreasonable to determine that Ms. Campbell statement - that she guessed, but did not know, that Petitioner and the victim had problems because she thought that Petitioner might have been friends with someone involved with another attempt on the victim's life - did not indicate that Petitioner was involved in the murder of September 22, 2008.

Instead, what tied Petitioner to the murder of the victim was Ms. Campbell's explicit identification of him as the killer in the hours following the shooting. ECF No. 14-2 at 710-13. But she recanted her identification of Petitioner, and testified that she made her statement of September 23, 2008 under duress. Trial Tr. dated Nov. 8-12, 2010, at 114 ("A: If I did not give [the detectives interviewing her] a name, they were going to charge me with conspiracy[;]" "A: I just told them what they wanted to hear so I could go home to my son or I wasn't going home.").

Petitioner has failed to meet his burden for relief as to this claim. It will be denied.

### 4.    The remaining portion of Ground Five

In the exhausted portion of Ground Five, Petitioner asserts that trial counsel was ineffective for not challenging Sergeant Wagner's allegedly fabricated identification of Petitioner

at trial.[16]  ECF No. 1 at 34; ECF No. 12 at 40.  This excludes Petitioner's argument with respect to allegedly deceptive photos being used to bolster Sergeant Wagner's testimony, which was not exhausted in the state court, and is procedurally defaulted.[17]

The portion of this claim that was exhausted before the Superior Court was at Issue No. 4 on PCRA appeal, and includes the following arguments.

> 4. Whether trial counsel ineffectively failed to attack testimony of William Wagner by (a) moving to suppress his suggestive identification, (b) disproving Wagner's testimony that the shooter was dressed suspiciously causing Wagner to keenly focus on his face, and (c) taking remedial action when Wagner testified for the first time at trial that he had made a prior identification of Mr. Engram.

ECF No. 14-2 at 381.

The Superior Court addressed this claim as follows.

> In his fourth claim, Engram states that Attorney Jobe was ineffective in failing to object to the identification testimony of Officer Wagner. *See* Brief for Appellant at 37-45. Engram argues that Officer Wagner's identification at trial of him as the shooter was the first time he had identified Engram as the shooter, which made the identification "unnecessarily suggestive and created a substantial risk of misidentification." *Id.* at 38.
>
> Here, Attorney Jobe extensively cross-examined Officer Wagner, and impeached the credibility of his testimony on other grounds. *See* N.T., 11/8-12/10, at 51-61, 67-68; *see also Dennis*, *supra*. Accordingly, we conclude that Engram's underlying claim lacks merit, and Attorney Jobe was not ineffective on these grounds. *See Treiber*, *supra*.

---

[16] It is noteworthy that trial counsel challenged Sergeant Wagner's testimony in a motion *in limine* filed on May 17, 2010, based on the prosecution's failure to timely disclose it, as well as on due process grounds.  ECF No. 14-1 at 61-64.

[17] To the extent that this Court is wrong, and the parties are correct that this issue was addressed by the Superior Court in its analysis of Issue No. 4 on appeal, see ECF No. 12 at 41; ECF No. 14 at 73, the inclusion of the allegedly deceptive photographs does not save Petitioner's ineffective assistance of counsel claim for the reasons articulated in Footnote 8, supra.

Engram, 2021 WL 225631, at *7 (emphasis as in original). This analysis appears to rest both on the first and second prongs of the Strickland test.

Prior to his trial testimony two police reports were created that memorialized Sergeant Wagner's statements to police regarding what he saw on the night of the murder. The first was written on September 23, 2008 – the day after the murder. ECF No. 14-2 at 765. It indicated that Sergeant Wagner was inside the gas station store drinking a cup of coffee along with other police officers, when he witnessed "an attractive black female [driving] though the lot in a black Pontiac G6." Id. She was pulling out of the lot when the shooting began. Sergeant Wagner looked toward the shooing, and observed a black male in his 20s wearing a black and white hooded sweatshirt shooting into the victim's SUV. Id.

Sergeant Wagner left the store, observed that the victim was unresponsive, and was told by an employee of a neighboring store that he had observed a black male exit a white SUV and walk to the gas station prior to the shooting. Id.

Sergeant Wagner gave a second statement on May 26, 2010 – which was memorialized in a report prepared on June 7, 2010. Id. at 766. His second statement was given more than 20 months after the murder was committed, and a little more than five months before trial began. It also was given after Shermaine Campbell had recanted their identification of Petitioner. Trial Tr. dated Nov. 8-12, 2010, at 98-113, 134-45. See also Prelim. Hr'g Tr. dated Oct. 17, 2008, at 12. Harold Fields – another witness who identified Petitioner and testified at trial – also recanted his identification. Trial Tr. dated Nov. 8-12, 2010, 134-45. See also ECF No. 14-1 at 725. It is unclear from the record if and when that took place prior to trial.

Sergeant Wagner's second statement included additional and different details from his first statement. Wagner stated that he was drinking coffee on the left side of the store if viewed

from entering the front door. He does not reference the attractive woman in a Pontiac, but says that he that he saw a black male crossing the street wearing a black and white hooded sweatshirt. ECF No. 14-2 at 766. Wagner – who was on overnight robbery detail – initially thought that this person was planning to rob the gas station. Id. His attention was drawn to Petitioner because it was a warm night, and Petitioner was wearing a hooded sweatshirt. Wagner remembered this because he was wearing his bulletproof vest, and was hot, sweaty, and uncomfortable. Id.

In his second statement, Wagner stated that "he could clearly see the male's face" because the area was so well lit. Id. Wagner also had an unobstructed view of the shooting because the store had a large window – although he did not see the victim's SUV pull into the parking lot prior to the shooting. Id. at 767. He watched the man walk to the parking lot, reach into his pants, remove a handgun, and start firing. Id. at 766. Wagner initially though that the shooter was firing into another car, but then realized that he was firing into the victim's SUV. Id. at 766-67.

After the shooting, the shooter fled. Wagner ran out of the store, and drew his gun on another individual associated with the car into which Wagner initially thought the shooter was firing. Id. at 767. After realizing his mistake, Wagner chased the shooter across the street, but stopped at a corner with a side street because he was afraid of being ambushed. Id.

That credibility issues exist with respect to Sergeant Wagner's identification of Petitioner as the murderer is obvious. But, as the Superior Court found in its PCRA opinion, trial counsel ably exploited those issues to impeach Wagner's credibility. See Trial Tr. dated Nov. 8-12, 2010, at 51-61 and 67-68. This includes the following.

- The lengthy period of time between Wagner's two reports. Id. at 50.
- Differences in the content of Wagner's 2008 and 2010 statements to police. Id. at 51-56, 61.

- That nothing that the September 23, 2008 report indicated that Wagner had watched the shooter cross the street or that Wagner could see the shooter's face. Id. at 53.

- The positioning of the SUV and the shooter relative to Wagner's asserted point of view, and Wagner's concession that he could not see the driver's side of the victim's SUV, where the shooting took place. Id. at 56-58.

- The fact that Wagner could not see tattoos on the hands of the shooter (Petitioner had tattoos on his hands) because "he could not see through the truck." Id. at 59.

- The fact that Wagner never was shown a photo array. Id. at 50, 66-67.

- That Wagner did not initially know who the shooter was, until "days later." Id. at 67.

Trial counsel also hammered Wagner's credibility issues in his closing arguments, including whether Wagner actually was able to see anything at all. Id. at 305-11.[18]

Upon review of the record, the undersigned cannot say that the Superior Court's determination was based on an unreasonable application of Strickland or the facts. It is not unreasonable to determine that, had trial counsel made the arguments that Petitioner has exhausted and raises before this Court with respect to this claim, there would not be a reasonable probability that the result of the proceeding would have been different. Accordingly, the exhausted portion of Ground Five will be denied.

## V.    CERTIFICATE OF APPEALABILITY

A certificate of appealability will be granted only as to the exhausted portion of Ground One for the reasons stated above. Slack, 529 U.S. at 484. A certificate of appealability on all

---

[18] To the extent that Petitioner believes that trial counsel should have impeached Wagner regarding his recollection of the temperature of the night of the murder, the undersigned notes that the surveillance video on which Petitioner relies to support Ground Two shows multiple individuals traversing the parking lot of the gas station after the murder in what appear to be short sleeves, and one individual entering the store just before the murder wearing shorts and a t-shirt. See Part IV.B.2, supra. Petitioner has failed to establish that this line of questioning would have affected Wagner's credibility one way or another.

remaining claims will be denied. Jurists of reason would not debate that Petitioner has failed to make a substantial showing of a denial of a constitutional right with respect to the remaining claims that were denied on the merits. Id.; 28 U.S.C. § 2253(d). As to the claims denied on procedural ground, jurists of reason would not debate that this Court was correct in its procedural ruling and/or that the defaulted claims state a valid claim of a denial of a constitutional right. Slack, 529 U.S. at 474.

## VI.    CONCLUSION

For the foregoing reasons, the Petition, ECF No. 1, will be denied. A certificate of appealability as to the portion of Ground One asserting that trial counsel was ineffective for failing to investigate Petitioner's alibi defense will be granted. A certificate of appealability will be denied as to all other grounds for relief.

An appropriate order follows.

Dated: March __//__, 2025

BY THE COURT,

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc:    All counsel of record (*via* CM/ECF)